# EXHIBIT A

| | |
|---|---|
| **From:** | Lori Anderson <landerson@mc2b.com> on behalf of Lori Anderson |
| **Sent:** | Tuesday, February 02, 2021 4:59 PM |
| **To:** | perry.oldham@knobbe.com |
| **Cc:** | Jess Krannich |
| **Subject:** | Objections to Non-Party Subpoena Served in Masimo Corporation and Cercacor Laboratories, Inc. v. True Wearables, Inc. and Marcelo Lamego, 8:18-CV-02001-JVS-JDE |
| **Attachments:** | JKrannich to POldham FINAL 02.02.21 (02126083-3).pdf |

Mr. Oldham,

Please see the attached correspondence from Jess M. Krannich in the above-referenced matter.

Thank you.

Lori Anderson, Legal Assistant
Manning Curtis Bradshaw & Bednar PLLC
136 East South Temple, Suite 1300
Salt Lake City, Utah 84111
801-363-5678 (Office)
801-364-5678 (Facsimile)
landerson@mc2b.com



136 East South Temple, Suite 1300
Salt Lake City, Utah 84111
(801) 363-5678
Facsimile: (801) 364-5678
www.mc2b.com
Jess M. Krannich
jkrannich@mc2b.com

February 2, 2021

<u>VIA EMAIL</u>

Knobbe, Martens, Olson & Bear, LLP
Perry D. Oldham
2040 Main St., 14th Fl.
Irvine, CA 92614
perry.oldham@knobbe.com

Re:    Objections to Non-Party Subpoena Served in *Masimo Corporation and Cercacor Laboratories, Inc. v. True Wearables, Inc. and Marcelo Lamego*, 8:18-CV-02001-JVS-JDE

Dear Mr. Oldham:

Owlet Baby Care, Inc. ("Owlet") has retained this law firm to represent it in responding to the third-party document subpoena (the "Subpoena") you caused to be served on it in connection with the above-referenced lawsuit (the "Lawsuit") currently pending in the United States District Court for the Central District of California.

Enclosed with this letter are Owlet's objections to the Subpoena, which is improper for several reasons. Most significantly, the Subpoena purports to demand that Owlet, a nonparty with no connection to the Lawsuit, disclose highly confidential, sensitive, and proprietary algorithms to direct competitors Masimo Corporation and Cercacor (collectively, "Masimo"). As you are undoubtedly aware, Federal Rule of Civil Procedure 45(d)(3)(B) protects nonparties from being compelled to disclose confidential information that is irrelevant to the underlying litigation. Indeed, in the Tenth Circuit, once a nonparty shows that the information sought is both confidential and "might be harmful if disclosed . . .[,] the burden shifts to the party seeking discovery to establish that the disclosure is both relevant and necessary." *Int'l Coal Group, Inc. v. Tetra Fin. Group, LLC*, 2010 WL 2079675, at *1 (D. Utah May 24, 2010) (citation omitted); *Centurion Industries, Inc. v. Warren Steurer and Assocs.*, 665 F.2d 323, 325 (10th Cir. 1981). And courts presume harm when the parties in question "are direct competitors in the same industry." *Int'l Coal Group*, 2010 WL 2079675, at *2 (citing *Echostar Comm'ns Corp.*, 180 F.R.D. 391, 395 (D. Colo. 1998)).

Owlet's algorithms are undeniably the type of confidential information entitled to protection under Rule 45(d)(3)(B) and their potential disclosure to Masimo, a direct competitor, entitles Owlet to a presumption of harm. Nevertheless, the Subpoena and your accompanying cover letter do not even attempt to explain why the disclosure of Owlet's algorithms is not just relevant, but <u>*necessary*</u> to Masimo's claims against True Wearables and Marcelo Lamego. *Id.* at *2 (granting motion to quash

Perry D. Oldham
Knobbe, Martens, Olson & Bear, LLP
February 2, 2021
Page 2

subpoena where party seeking discovery showed relevance, but not necessity, of confidential information).  Owlet thus fails to see how a court could possibly find that Masimo's need for these algorithms outweighs the substantial injury Owlet would suffer as a result of their disclosure.  And to the extent that Masimo seeks the algorithms for purposes unrelated to this Lawsuit, courts in the Tenth Circuit have rebuffed similar subpoenas with "possible ulterior motives."  *Echostar Comm'ns Corp.*, 180 F.R.D. at 395.

Your cover letter asserts that the Lawsuit's protective order will preserve the confidentiality of Owlet's algorithms.  It is important to note, however, that "[t]he existence of a protective order . . . even a fairly restrictive order . . . does not negate the fact that" the algorithms are "only marginally relevant" (if at all) to the Lawsuit.  *Id.*  Nor does it negate the fact that Masimo has not even tried to demonstrate how the algorithms' non-disclosure "will cause [it] to suffer undue hardship."  *Id.* (citing *R & D Business Systems v. Xerox Corp.*, 152 F.R.D. 195, 198 (D. Colo. 1993)).  Irrespective of the protective order, the fact remains that Masimo has shown no legitimate purpose for subpoenaing a nonparty competitor for the competitor's most valuable and protected information.

Relatedly, in calling for this entirely irrelevant information, the Subpoena also runs afoul of Rules 26 and 45 of the Federal Rules of Civil Procedure.  Owlet is not surprised that the Subpoena and cover letter do not attempt to explain Masimo's need for the requested documents; it is clear from the face of the operative complaint that Owlet and its algorithms have nothing to do with the Lawsuit.  Owlet is a third-party that has at all times operated entirely at arm's length from Masimo, True Wearables, and their respective leadership—Lamego included.  The subpoena is therefore improper under the "axiomatic" rule "that a party cannot take [discovery] for purposes unrelated to the lawsuit at hand."  *Id.* (citation omitted).  Likewise, the patently overbroad Subpoena does not attempt to specify or place any parameters whatsoever around the types of documents Masimo seeks, imposing an undue burden on Owlet that requires the Subpoena be quashed under Rule 45(d)(3)(A).

Finally, the Subpoena is procedurally deficient because it purports to require compliance at a location over 100 miles from where Owlet resides or regularly conducts business.  *See* Federal Rule of Civil Procedure 45(c)(2)(A).  The Subpoena demands compliance at your office in Irvine California.  But Owlet is a Delaware corporation with its principal place of business in Utah.  And although Owlet transacts business nationwide, it resides and regularly transacts business *in person* in Utah, not in Irvine or anywhere else in California.  Accordingly, under Rule 45(c)(2)(A)'s plain language, the Subpoena should have sought production in the District of Utah and is defective on that basis as well.  *See Miller v. Holzmann*, 471 F. Supp. 2d 119, 121 (D.D.C. 2007) (explaining that the "limitation" in Rule 45(c)(2)(A) applies "unequivocally" to the production of documents "at a distance more than 100 miles from one's home"); *Nieman v. Linkedin Corp.*, 2013 WL 685203, at *2 (N.D. Cal. Feb. 25, 2013) ("nonparties cannot be required to produce documents at a location more than 100 miles from their home or business").

Perry D. Oldham
Knobbe, Martens, Olson & Bear, LLP
February 2, 2021
Page 3

    Enclosed herewith are Owlet's Objections to the Subpoena.  To the extent you have
questions or would like to discuss the requests or our objections on behalf of Owlet, we would be
happy to meet and confer with you on a mutually convenient date and time.


                        Sincerely,


                        MANNING CURTIS BRADSHAW & BEDNAR PLLC



                        Jess M. Krannich

                        *Attorneys for Owlet Baby Care, Inc.*


Enclosure(s):    (1)

### NON-PARTY OWLET BABY CARE, INC.'S OBJECTIONS TO THE SUBPOENA SERVED BY MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.

Owlet Baby Care, Inc. ("Owlet") hereby objects to the subpoena (the "Subpoena") served upon it by Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo") in the case styled *Masimo Corporation and Cercacor Laboratories, Inc. v. True Wearables, Inc. and Marcelo Lamego*, 8:18-CV-02001-JVS-JDE (hereinafter the "Case" or the "Lawsuit"). Owlet is not a party to the Lawsuit and serves these objections upon Masimo pursuant to Rule 45.

### GENERAL OBJECTION

Owlet objects to this Subpoena on the grounds that it purports to command the production of documents, electronically stored information, and tangible things at a place that is over 100 miles from where Owlet resides or regularly transacts business in person, in violation of Federal Rule of Civil Procedure 45(c)(2)(A). The Subpoena commands production at the offices of Knobbe, Martens, Olson & Bear, LLP in Irvine California. Owlet is a Delaware corporation with its headquarters and principal place of business in Utah. Although Owlet sells products to consumers nationwide, it does not regularly transact business *in person* in Irvine or the State of California in general. Owlet resides and regularly transacts business in person in Utah, which is well over 100 miles away from the Subpoena's mandated place of compliance. The Subpoena therefore runs afoul of Rule 45(c)(2)(A) and Owlet objects to its issuance on that basis. The proper place of compliance for this Subpoena would be in the District of Utah.

### OBJECTIONS TO DOCUMENT REQUESTS

With respect to the numbered document requests set forth in the Subpoena, Owlet specifically objects as follows.

**<u>REQUEST FOR PRODUCTION NO 1.:</u>**

Documents sufficient to show your algorithms for measuring pulse rate and/or oxygen saturation in humans based on optical signals.

**<u>OBJECTION:</u>**

Owlet objects that this Request is unduly burdensome because the information requested is irrelevant and not calculated to lead to the discovery of admissible evidence. Based on a review of Masimo's Complaint, this Case is about the actions of one man—Marcelo Lamego—and whether those actions injured Masimo. Owlet is a third-party that has at all times operated entirely at arm's length from Masimo, True Wearables, and their respective leadership, including Mr. Lamego. Indeed, until receiving the Subpoena, Owlet had no knowledge of, let alone involvement with, Mr. Lamego or his allegedly infringing activity. Owlet thus fails to see—and Masimo does not even attempt to explain—how reviewing Owlet's highly-confidential and sensitive algorithms might help Masimo prove that Lamego breached his employment contracts, misappropriated Masimo's trade secrets, or infringed on Masimo's patents. Owlet's algorithms are proprietary formulas entirely separate from those used by Masimo and True Wearables, and their content will not help Masimo meet its burden on its patent infringement claims (let alone its completely unrelated claims for breach of contract and trade-secret misappropriation). Therefore, because Masimo's Request is irrelevant and not calculated to lead to the discovery of admissible evidence, Owlet declines to produce the requested information.

Owlet further objects that this Request purports to require it to disclose its trade secrets and other confidential research, development, and commercial information to a direct competitor. Owlet's algorithms for determining pulse rate and oxygen saturation are proprietary, sensitive, and highly confidential. Their disclosure and potential misuse in a case in which Owlet has

2

absolutely no stake or involvement thus risks substantially impairing Owlet's business and giving Masimo an improper competitive advantage.  Accordingly, the potential harm that would occur from disclosing the requested documents far outweighs any utility they provide to Masimo in proving its claims, and Owlet declines to produce them on this basis.

**REQUEST FOR PRODUCTION NO 2.:**

Documents and things relating to algorithms for determining pulse rate and/or oxygen saturation based on use of an idealized triangular waveform model of physiological plethysmographic waveform.

**OBJECTION:**

Owlet objects to this Request as overbroad, vague, and unduly burdensome.  The phrase "documents and things relating to" makes absolutely no attempt to specify, provide examples of, or set any parameters whatsoever around the types of documents Masimo seeks.  Owlet is therefore left to speculate about what documents it is being requested to produce—guesswork that is unduly burdensome in light of the fact that Owlet is a stranger to this case with no meaningful understanding of the underlying facts or how those facts could possibly concern Owlet's algorithms.  The vagueness inherent in this request is further exacerbated by Masimo's use of the undefined term "relating to," an overly broad term which, on its face, could encompass every email concerning every decision made about the algorithms in question since Owlet's inception.  Compliance with the plain language of this Request would therefore potentially require Owlet to gather thousands, if not hundreds of thousands, of documents that are irrelevant to this case.  Accordingly, Owlet declines to respond to this patently overbroad and unduly burdensome request.

3

Owlet further objects that this Request is unduly burdensome because the information requested is irrelevant and not calculated to lead to the discovery of admissible evidence.  Based on a review of Masimo's Complaint, this Case is about the actions of one man—Marcelo Lamego—and whether those actions injured Masimo.  Owlet is a third-party that has at all times operated entirely at arm's length from Masimo, True Wearables, and their respective leadership, including Mr. Lamego.  Indeed, until receiving the Subpoena, Owlet had no knowledge of, let alone involvement with, Mr. Lamego or his allegedly infringing activity.  Owlet thus fails to see—and Masimo does not even attempt to explain—how reviewing Owlet's highly-confidential and sensitive algorithms will help Masimo prove that Lamego breached his employment contracts, misappropriated Masimo's trade secrets, or infringed on Masimo's patents.  Regardless of the means by which Owlet's algorithms determine pulse rate and oxygen saturation, those algorithms are proprietary formulas entirely separate from those used by Masimo and True Wearables, and their content will not help Masimo meet its burden on its patent infringement claims (let alone its completely unrelated claims for breach of contract and trade-secret misappropriation).  Therefore, because Masimo's Request is irrelevant and not calculated to lead to the discovery of admissible evidence, Owlet declines to produce the requested information.

Finally, Owlet objects that this Request purports to require it to disclose its trade secrets and other confidential research, development, and commercial information to a direct competitor.  Owlet's algorithms for determining pulse rate and oxygen saturation are proprietary, sensitive, and highly confidential.  Their disclosure and potential misuse in a case in which Owlet has absolutely no stake or involvement thus risks substantially impairing Owlet's business and giving Masimo an enormous competitive advantage.  Accordingly, the potential harm that would

occur from disclosing the requested documents far outweighs any utility they provide to Masimo in proving its claims, and Owlet declines to produce them on this basis.

### REQUEST FOR PRODUCTION NO 3.:

Documents and things relating to algorithms for calculating pulse rate, oxygen saturation, or perfusion index by transforming one or more sensor signals to a domain that is indexed by frequency.

### OBJECTION:

Owlet objects to this Request as overbroad, vague, and unduly burdensome.  The phrase "documents and things relating to" makes absolutely no attempt to specify, provide examples of, or set any parameters whatsoever around the types of documents Masimo seeks.  Owlet is therefore left to speculate about what documents it is being requested to produce—guesswork that is unduly burdensome in light of the fact that Owlet is a stranger to this case with no meaningful understanding of the underlying facts or how those facts could possibly concern Owlet's algorithms.  The vagueness inherent in this request is further exacerbated by Masimo's use of the undefined term "relating to," an overly broad term which, on its face, could encompass every email concerning every decision made about the algorithms in question since Owlet's inception.  Compliance with the plain language of this Request would therefore potentially require Owlet to gather thousands, if not hundreds of thousands, of documents that are ir relevant to this case.  Accordingly, Owlet declines to respond to this patently overbroad and unduly burdensome request.

Owlet further objects that this Request is unduly burdensome because the information requested is irrelevant and not calculated to lead to the discovery of admissible evidence.  Based on a review of Masimo's Complaint, this Case is about the actions of one man—Marcelo

5

Lamego—and whether those actions injured Masimo.  Owlet is a third-party that has at all times operated entirely at arm's length from Masimo, True Wearables, and their respective leadership, including Mr. Lamego.  Indeed, until receiving the Subpoena, Owlet had no knowledge of, let alone involvement with, Mr. Lamego or his allegedly infringing activity.  Owlet thus fails to see—and Masimo does not even attempt to explain—how reviewing Owlet's highly-confidential and sensitive algorithms will help Masimo prove that Lamego breached his employment contracts, misappropriated Masimo's trade secrets, or infringed on Masimo's patents.  Regardless of the means by which Owlet's algorithms determine pulse rate and oxygen saturation, those algorithms are proprietary formulas entirely separate from those used by Masimo and True Wearables, and their content will not help Masimo meet its burden on its patent infringement claims (let alone its completely unrelated claims for breach of contract and trade-secret misappropriation).  Therefore, because Masimo's Request is irrelevant and not calculated to lead to the discovery of admissible evidence, Owlet declines to produce the requested information.

Finally, Owlet objects that this Request purports to require it to disclose its trade secrets and other confidential research, development, and commercial information to a direct competitor.  Owlet's algorithms for determining pulse rate and oxygen saturation are proprietary, sensitive, and highly confidential.  Their disclosure and potential misuse in a case in which Owlet has absolutely no stake or involvement thus risks substantially impairing Owlet's business and giving Masimo an enormous competitive advantage.  Accordingly, the potential harm that would occur from disclosing the requested documents far outweighs any utility they provide to Masimo in proving its claims, and Owlet declines to produce them on this basis.

**REQUEST FOR PRODUCTION NO 4.:**

Documents and things relating to algorithms for calculating pulse rate, oxygen saturation, or perfusion index by searching a basis function index.

**OBJECTION:**

Owlet objects to this Request as overbroad, vague, and unduly burdensome.  The phrase "documents and things relating to" makes absolutely no attempt to specify, provide examples of, or set any parameters whatsoever around the types of documents Masimo seeks.  Owlet is therefore left to speculate about what documents it is being requested to produce—guesswork that is unduly burdensome in light of the fact that Owlet is a stranger to this case with no meaningful understanding of the underlying facts or how those facts could possibly concern Owlet's algorithms.  The vagueness inherent in this request is further exacerbated by Masimo's use of the undefined term "relating to," an overly broad term which, on its face, could encompass every email concerning every decision made about the algorithms in question since Owlet's inception.  Compliance with the plain language of this Request would therefore potentially require Owlet to gather thousands, if not hundreds of thousands, of documents that are irrelevant to this case.  Accordingly, Owlet declines to respond to this patently overbroad and unduly burdensome request.

Owlet further objects that this Request is unduly burdensome because the information requested is irrelevant and not calculated to lead to the discovery of admissible evidence.  Based on a review of Masimo's Complaint, this Case is about the actions of one man—Marcelo Lamego—and whether those actions injured Masimo.  Owlet is a third-party that has at all times operated entirely at arm's length from Masimo, True Wearables, and their respective leadership, including Mr. Lamego.  Indeed, until receiving the Subpoena, Owlet had no knowledge of, let

7

alone involvement with, Mr. Lamego or his allegedly infringing activity.  Owlet thus fails to see—and Masimo does not even attempt to explain—how reviewing Owlet's highly-confidential and sensitive algorithms will help Masimo prove that Lamego breached his employment contracts, misappropriated Masimo's trade secrets, or infringed on Masimo's patents. Regardless of the means by which Owlet's algorithms determine pulse rate and oxygen saturation, those algorithms are proprietary formulas entirely separate from those used by Masimo and True Wearables, and their content will not help Masimo meet its burden on its patent infringement claims (let alone its completely unrelated claims for breach of contract and trade-secret misappropriation).  Therefore, because Masimo's Request is irrelevant and not calculated to lead to the discovery of admissible evidence, Owlet declines to produce the requested information.

Finally, Owlet objects that this Request purports to require it to disclose its trade secrets and other confidential research, development, and commercial information to a direct competitor. Owlet's algorithms for determining pulse rate and oxygen saturation are proprietary, sensitive, and highly confidential.  Their disclosure and potential misuse in a case in which Owlet has absolutely no stake or involvement thus risks substantially impairing Owlet's business and giving Masimo an enormous competitive advantage.  Accordingly, the potential harm that would occur from disclosing the requested documents far outweighs any utility they provide to Masimo in proving its claims, and Owlet declines to produce them on this basis.

Respectfully submitted this 2nd day of February, 2021.

MANNING CURTIS BRADSHAW & BEDNAR PLLC


/s/ Jess M. Krannich
Jess M. Krannich
*Attorneys for Owlet Baby Care*

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

2040 Main St., 14th Fl., Irvine, CA 92614
T (949) 760-0404

Perry D. Oldham
Perry.Oldham@knobbe.com

January 19, 2021

**Via Process Server**

Owlet Baby Care Inc.
2500 Executive Pkwy
Suite 500
Lehi, UT 84043

Re:    *Masimo Corporation and Cercacor Laboratories, Inc.*
                                    *v.*
       *True Wearables, Inc. and Marcelo Lamego*
       <u>Civil Action No. 8:18-CV-02001-JVS-JDE</u>

To Whom It May Concern:

    We represent Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc. in a lawsuit against True Wearables, Inc. and Marcelo Lamego in the U.S. District Court for the Central District of California.

    We enclose a subpoena seeking relevant documents in your possession, custody, or control. A description of the categories of the requested documents is set forth in Exhibit A to the subpoena.

    To the extent that responding to the subpoenas may involve disclosure of confidential information, the parties' protective order will preserve the confidentiality of such information (See Exhibit A Instructions at No. 9).

    We look forward to discussing the subpoena with you, so we can work on obtaining the requested information as efficiently as possible. You or your counsel can reach us directly at 949-760-0404 or perry.oldham@knobbe.com. Thank you for your cooperation.

Sincerely,

*Perry Oldham*

Perry D. Oldham

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| Masimo Corporation and Cercacor Laboratories, Inc. | ) | |
|---|---|---|
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  8:18-CV-02001-JVS-JDE |
| True Wearables, Inc. and Marcelo Lamego | ) | |
| | ) | |
| *Defendant* | ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:            Owlet Baby Care Inc., 2500 Executive PKWY Suite 500, Lehi, UT 84043
(Agent for service: United Corporate Services, Inc., 874 Walker Rd. Ste C, Dover, DE 19904)

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Please see Exhibit A,

| Place: Knobbe, Martens, Olson & Bear, LLP, 2040 Main Street, 14th Floor, Irvine, CA 92614. | Date and Time: 02/18/2021 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      01/19/2021

                          *CLERK OF COURT*

                                                      OR

                                                                /s/ Perry Oldham
_____                      _____
    *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*      Plaintiffs
Masimo Corporation and Cercacor Laboratories, Inc.                    , who issues or requests this subpoena, are:

Perry Oldham; 2040 Main Street, 14th Floor, Irvine, CA 92614; perry.oldham@knobbe.com; (949) 760-0404

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  8:18-CV-02001-JVS-JDE

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____              _____
                                              *Server's signature*

                                              _____
                                              *Printed name and title*

                                              _____
                                              *Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## EXHIBIT A

Pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, and in accordance with the following definitions and instructions, Plaintiffs request that Owlet Baby Care Inc. produce the documents and things identified in the requests for production below.

## DEFINITIONS

1.     The term "documents" is used in the broadest sense possible under Rule 34 of the Federal Rules of Civil Procedure, and includes all written or graphic matter, however produced or reproduced, including, but not limited to, originals (or copies where originals are unavailable) of correspondence, electronic mail, computer storage media (including, but not limited to, all active, inactive, and archived data files stored on hard drives, operating systems, software, floppy disks, magnetic tapes, zip drives, CD-ROMS, mainframe computers, desktop computers, home computers, laptops, mobile handheld devices, retired computer systems or any other storage medium), computer software needed to produce in human-readable form data from said computer storage media, instructions for using said computer software, telegrams, notes or sound recordings of any type of personal or telephone conversations, or of meetings or conferences, minutes of directors or committee meetings, memoranda, inter-office communications, studies, analyses, reports, engineering drawings, results of investigations, catalogs, contracts, licenses, agreements, working papers, statistical records, ledgers, books of account, vouchers, invoices, charge slips, freight bills, time sheets or logs, stenographers' notebooks, diaries, or papers similar to any of the foregoing, however denominated.

2.     The terms "communication" or "communications" mean any communication regardless of the manner in which the communication(s) took place, including, but not limited to, face-to-face conversations, correspondence, electronic or computer mail, telephone calls, facsimile communications, or

-1-

1 telegrams.

2       3.     The terms "describe," "described" or "description" when used with
3 respect to any act, action, accounting, activity, audit, practice, process, occurrence,
4 course of conduct, happening, negotiation, relationship, scheme, communication,
5 conference, discussion, development, service, transaction, instance, incident or
6 event, means provide any or all of the following information (to the extent it is
7 available to you): its general nature; the time and place thereof; a chronological
8 account setting forth each element thereof, what such element consisted of, and
9 what transpired as a part thereof; the identity of each person who performed any
10 function or had any role in connection therewith (e.g., speaker, participant,
11 contributor of information, witness) or who has any knowledge thereof together
12 with a description of each person's function, role, or knowledge; the identity of
13 each document which refers thereto or which was used, referred to, or prepared in
14 the course or as a result thereof; and identification of each communication which
15 was a part thereof or referred thereto.   When used in connection with any
16 evaluation, calculation, or computation, the terms "describe," "described" or
17 "description" mean provide any or all the following information: an explanation of
18 its meaning; an explanation of the manner in which it was derived; the identity of
19 each person who performed any function with respect thereto and a description of
20 his or her function; the identity of each document which refers thereto or which
21 was used, referred to, or prepared in the course of or as a result thereof; and the
22 identity of each communication which occurred in the course of the preparation
23 thereof or which referred thereto.

24       4.     The term "You," "Your," and "Owlet" means Owlet Baby Care Inc.
25 and any present or former principal, officer, director, employee, former employee,
26 servant, agent, attorney, or other representative acting on its behalf, and shall
27 include any parent, subsidiary, division, predecessor, successor, or affiliate.

28 / / /

5.     The terms "person," "individual," and "entity" shall include natural persons, corporations, and other legal or business entities, whether or not in your employ, and the acts and knowledge of a person, individual or entity are defined to include the acts and knowledge of that person's, individual's, or entity's directors, officers, members, employees, representatives, agents, and attorneys.

6.     The singular form of any noun or pronoun used herein includes within its meaning the plural form thereof and vice versa; the neuter, masculine or feminine form of any pronoun used herein includes within its meaning the neuter, masculine and feminine forms; and the use herein of any tense of any verb includes within its meaning all other tenses of the verb.  In every such instance, the specific request shall be construed in the broadest sense so as to call for the most complete and inclusive answer.

7.     The terms "and" and "or" shall be construed both conjunctively and disjunctively, and the plural shall be construed as the singular, and vice versa, as necessary and in order to bring within the scope of these requests for production all documents that might otherwise be construed to be outside their scope.

## INSTRUCTIONS

1.     You are to produce every document and thing requested that is in your possession, custody, or control, or within the possession, custody, or control of any employees, agents, consultants, attorneys, and/or any other persons acting or purporting to act on your behalf.

2.     If you have any good faith objection to any request or any part thereof, the specific nature of the objection and whether it applies to the entire request or to a part of the request shall be stated.  If there is an objection to any part of a request, then the part objected to should be identified and documents responsive to the remaining unobjectionable part should be produced.

3.     Each request shall be answered separately.

4.     Each request shall be answered on the basis of your entire

-3-

knowledge, from all sources.

5.     For each document and thing requested herein that you withhold or redact under a claim of attorney-client privilege, work product immunity, or any other privilege or immunity, you shall provide an explanation of the basis for the claim, including:

     a.  the date of the document;

     b.  the type of document (e.g., letter, memorandum, etc.);

     c.  the name and title of any and all authors or senders and any and all addressees and copy recipients of the document and any and all persons to whom the document was shown or to whom its subject matter was disclosed;

     d.  the name of each person or persons (other than stenographic or clerical assistants) participating in the preparation of the document or in whose name the document was prepared;

     e.  the subject matter of the document;

     f.  the REQUEST FOR PRODUCTION to which the document is responsive; and

     g.  a statement of the basis upon which the document has been redacted or withheld, including the specific nature of the privilege or exemption claimed and the detailed grounds for claiming such

6.     For any document requested herein that has been destroyed or misplaced, you shall provide the information described in paragraphs 5(a)-(e) above, as well as a brief explanation of the circumstances (when, how, by whom, and why) surrounding the document's destruction or loss, and any and all records pertaining to its destruction or loss.

7.     If you or your attorneys know of the existence, past or present, of any document described in a request, but such document is not presently in your possession, custody, or control or in the possession, custody, or control of its

-4-

1  agents, representatives, or attorneys, you shall so state in response to the request,
2  identify such document in response to the request, and identify the individual in
3  whose possession, custody, or control the document was last known to reside.

4    8.    Documents shall be produced as they are maintained in the normal
5  course of business, including:

6    a. all associated file labels, file headings, and file folders shall be
7       produced together with the responsive documents from each file, and
8       each file shall be identified as to its owner or custodian;

9    b. all documents that cannot be legibly copied shall be produced in their
10      original form; otherwise, you may produce photocopies; and

11   c. each page shall be given a discrete production number.

12   9.    The documents and things produced by You in response to this
13  subpoena may be designated "CONFIDENTIAL," "CONFIDENTIAL –
14  ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE
15  CODE" in accordance with the Protective Order that has been entered in this
16  litigation.

17   10.   A copy of the Protective Order is included as Addendum 1, and a
18  copy of the First Amended Complaint is included as Addendum 2 to these
19  Document Requests.

20            **REQUESTS FOR PRODUCTION**
21  **REQUEST FOR PRODUCTION NO. 1:**

22   Documents sufficient to show your algorithms for measuring pulse rate
23  and/or oxygen saturation in humans based on optical signals.

24  **REQUEST FOR PRODUCTION NO. 2:**

25   Documents and things relating to algorithms for determining pulse rate
26  and/or oxygen saturation based on use of an idealized triangular waveform model
27  of physiological plethysmographic waveform.

28  / / /

-5-

**REQUEST FOR PRODUCTION NO. 3:**

Documents and things relating to algorithms for calculating pulse rate, oxygen saturation, or perfusion index by transforming one or more sensor signals to a domain that is indexed by frequency.

**REQUEST FOR PRODUCTION NO. 4:**

Documents and things relating to algorithms for calculating pulse rate, oxygen saturation, or perfusion index by searching a basis function index.

# ADDENDUM 1

1
2
3
4
5
6
7
8       UNITED STATES DISTRICT COURT
9       CENTRAL DISTRICT OF CALIFORNIA
10      SOUTHERN DIVISION

11  | MASIMO CORPORATION, a | ) | Case No. 8:18-cv-2001-JVS-JDEx |
12  | Delaware Corporation; and | ) | |
    | CERCACOR LABORATORIES, INC., | ) | |
13  | a Delaware corporation, | ) | PROTECTIVE ORDER |
14  | | ) | |
    | Plaintiffs/Counterdefendants, | ) | |
15  | | ) | |
16  | v. | ) | |
    | | ) | |
17  | TRUE WEARABLES, INC., a | ) | |
18  | Delaware corporation; and MARCELO | ) | |
    | LAMEGO, an individual, | ) | |
19  | | ) | |
20  | Defendants/Counterclaimants. | ) | |

21

22      Based on the Joint Stipulation (Dkt. 82-1) and related filings (Dkt. 82, Dkt.

23  82-2 to 82-9, and Dkt. 86-89) by Plaintiffs and Counterdefendants MASIMO

24  CORPORATION ("Masimo") and CERCACOR LABORATORIES, INC.

25  ("Cercacor") (collectively "Plaintiffs"), on the one hand, and Defendants TRUE

26  WEARABLES, INC. ("True Wearables") and MARCELO LAMEGO

27  ("Lamego") (collectively "Defendants"), on the other hand, hereafter collectively

28  referred to as "the Parties," by which the Parties seek a protective order ("Order")

-1-

1  limiting disclosure thereof in accordance with Federal Rule of Civil Procedure

2  26(c), and good cause appearing therefor,

3       The Court hereby FINDS and ORDERS that:

4       1.     This action is likely to involve trade secrets, customer and pricing

5  lists and other valuable research, development documentation, source code,

6  hardware specifications, schematics, algorithms, prototypes, test reports, market

7  projections, sales reports, revenue reports, profit reports, cost of goods, sales

8  projections and forecasts, financial reports, business strategies, and other

9  valuable research, development, commercial, financial, technical and/or

10 proprietary information for which special protection from public disclosure and

11 from use for any purpose other than prosecution of this action is warranted.  Such

12 confidential and proprietary materials and information consist of, among other

13 things, confidential business or financial information, information regarding

14 confidential business practices, or other confidential research, development, or

15 commercial information (including information implicating privacy rights of

16 third parties), information otherwise generally unavailable to the public, or which

17 may be privileged or otherwise protected from disclosure under state or federal

18 statutes, court rules, case decisions, or common law.  If such confidential and

19 proprietary information is not kept confidential, then the parties risk losing the

20 information's trade secret status and providing competitors with an unfair

21 advantage which could harm the parties' business.  Accordingly, to expedite the

22 flow of information, to facilitate the prompt resolution of disputes over

23 confidentiality of discovery materials, to adequately protect information the

24 parties are entitled to keep confidential, to ensure that the parties are permitted

25 reasonable necessary uses of such material in preparation for and in the conduct

26 of trial, to address their handling at the end of the litigation, and serve the ends

27 of justice, a protective order for such information is justified in this matter.  It is

28 the intent of the parties that information will not be designated as confidential for

1    tactical reasons and that nothing be so designated without a good faith belief that
2    it has been maintained in a confidential, non-public manner, and there is good
3    cause why it should not be part of the public record of this case.

4          2.     Discovery materials produced in this case may be labeled as one of
5    three categories: "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS'
6    EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE"
7    (collectively and individually, "DESIGNATED MATERIAL") as set forth
8    below. Each Party may designate as confidential for protection under this Order,
9    in whole or in part, any document, information or material that constitutes or
10   includes, in whole or in part, confidential or proprietary information or trade
11   secrets of the Party or a Third Party to whom the Party reasonably believes it
12   owes an obligation of confidentiality with respect to such document, information,
13   or material ("Protected Material"). This Order shall encompass not only
14   Protected Material, but also (1) any information copied or extracted from
15   Protected Material; (2) all copies, excerpts, summaries, or compilations of
16   Protected Material; (3) any testimony, conversations, or presentations by Parties
17   or their counsel that might reveal Protected Material; and (4) briefs memoranda
18   or other writings filed with the Court and exhibits thereto that contain or reflect
19   the content of any such Protected Material. All copies, reproductions, extracts,
20   digests, and complete or partial summaries prepared from any DESIGNATED
21   MATERIAL shall also be considered DESIGNATED MATERIAL and treated
22   as such under this Order.

23         3.     Protected Material shall be designated by the Party producing it by
24   affixing a legend or stamp on such document, information, or material as follows:
25   the    word    designating    the    category    of    Protected    Material,    i.e.,
26   "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY," or
27   "RESTRICTED CONFIDENTIAL SOURCE CODE," shall be placed clearly on
28   each page of the Protected Material (except deposition and hearing transcripts)

1  for which such protection is sought. For deposition and hearing transcripts, the
2  word designating the material (i.e., "CONFIDENTIAL," "CONFIDENTIAL –
3  ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE
4  CODE") shall be placed on the cover page of the transcript (if not already present
5  on the cover page of the transcript when received from the court reporter) by each
6  attorney receiving a copy of the transcript after that attorney receives notice of
7  the designation of some or all of that transcript as DESIGNATED MATERIAL.

8       4.    A designation of Protected Material (i.e., "CONFIDENTIAL,"
9  "CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "RESTRICTED
10  CONFIDENTIAL SOURCE CODE") may be made at any time.  Inadvertent or
11  unintentional production of documents, information, or material that has not been
12  designated as described herein shall not be deemed a waiver in whole or in part
13  of a claim for confidential treatment.  Any party that inadvertently or
14  unintentionally produces Protected Material without designating it as described
15  herein may request destruction of that Protected Material by notifying the
16  recipient(s), as soon as reasonably possible after the producing Party becomes
17  aware of the inadvertent or unintentional disclosure and providing replacement
18  Protected Material that is properly designated.  The recipient(s) shall then destroy
19  all copies of the inadvertently or unintentionally produced Protected Materials
20  and any documents, information, or material derived from or based thereon.

21      5.    Non-public documents, information, or material produced in
22  discovery in this Action, including but not limited to Protected Material
23  designated as DESIGNATED MATERIAL, shall be used by the receiving Party,
24  and its witnesses, experts, consultants, and other persons involved as permitted
25  recipients hereunder, only in the litigation of this Action and shall not be used for
26  any other purpose. Any person or entity who obtains access to DESIGNATED
27  MATERIAL or the contents thereof pursuant to this Order shall not make any
28  copies, duplicates, extracts, summaries, or descriptions of such DESIGNATED

1    MATERIAL or any portion thereof except as may be reasonably necessary in the
2    litigation of this Action. Any such copies, duplicates, extracts, summaries, or
3    descriptions shall be classified DESIGNATED MATERIALS and subject to all
4    of the terms and conditions of this Order.

5       6.   **CONFIDENTIAL**. This category of Protected Information
6    contains information or tangible things that qualify for protection under Federal
7    Rule of Civil Procedure 26(c), or contain confidential and/or proprietary
8    information not known or readily available to the general public. In determining
9    whether information should be designated as "CONFIDENTIAL," each party
10   agrees to use such designation only in good faith. CONFIDENTIAL documents,
11   information, and material may be disclosed only to the following persons, except
12   upon receipt of the prior written consent of the designating party, upon order of
13   the Court, or as set forth in paragraph 12 herein:

14          (a)   outside counsel of record in this Action for the Parties,
15                including partners, associates, employees, and staff of such
16                counsel to whom it is reasonably necessary to disclose the
17                information for this litigation and independent attorneys
18                contracted to assist outside counsel in connection with this
19                action and to whom it is reasonably necessary to disclose the
20                information for this litigation;

21          (b)   up to three (3) designated representatives (including in-house
22                counsel) for the Parties who either have responsibility for
23                making decisions dealing directly with the litigation of this
24                Action, or who are assisting outside counsel in the litigation
25                of this Action;

26          (c)   outside consultants or experts (i.e., not existing employees or
27                affiliates of a party or an affiliate of a Party) retained for the
28                purpose of this litigation, provided that: (1) such consultants

-5-

1    or experts are not presently employed by the Parties hereto for
2    purposes other than this Action; (2) before access is given, the
3    consultant or expert has completed the Undertaking attached
4    as Exhibit A ("Agreement to be Bound by Protective Order")
5    hereto and the same is served upon the producing Party with
6    (i) a current curriculum vitae of the consultant or expert, (ii)
7    a listing of each person or entity from whom the expert has
8    received compensation or funding for work in his or her areas
9    of expertise or to whom the expert has provided professional
10   services, including in connection with a litigation, at any time
11   during the preceding five years, and (iii) a listing (by name
12   and number of the case, filing date, and location of court) of
13   any litigation in connection with which the Expert has offered
14   expert testimony, including through a declaration, report, or
15   testimony at a deposition or trial, during the preceding five
16   years, at least seven (7) days before access to the
17   DESIGNATED MATERIAL is to be given to that consultant
18   or expert. The producing party may object to and notify the
19   receiving Party in writing that it objects to disclosure of
20   DESIGNATED MATERIAL to the consultant or expert.  The
21   Parties agree to promptly confer and use good faith to resolve
22   any such objection. If the Parties are unable to resolve any
23   objection, the objecting Party may file a motion with the
24   Court within such other time as the Parties may agree, seeking
25   a protective order with respect to the proposed disclosure.
26   The objecting Party shall have the burden of proving the need
27   for a protective order.  No disclosure shall occur until all such
28   objections are resolved by agreement or Court order;

  (d)  independent litigation support services, including persons working for or as court reporters, graphics or design services, jury or trial consulting services, and photocopy, document imaging, and database services retained by counsel and reasonably necessary to assist counsel with the litigation of this Action;

  (e)  the Court and its personnel;

  (f)  any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order; and

  (g)  an author, signatory, or prior recipient of the document or the original source of the CONFIDENTIAL information. Such person shall be given access only to the specific document or information therein.

  7.  To the extent a producing Party believes that certain Protected Material qualifying to be designated CONFIDENTIAL is so sensitive that its dissemination deserves even further limitation, the producing Party may designate such Protected Material "CONFIDENTIAL – ATTORNEYS' EYES ONLY" (or alternatively "CONFIDENTIAL – AEO"). To the extent such Protected Material includes computer source code and/or live data (that is, data as it exists residing in a database or databases) (i.e., "Source Code Material"), the producing Party may designate such Protected Material as "RESTRICTED CONFIDENTIAL SOURCE CODE."

  8.  **CONFIDENTIAL – ATTORNEYS' EYES ONLY.** This category of Protected Material includes confidential information or items that the designating party has a good faith belief constitutes or contains trade secrets or other non-public, highly confidential research, development, technical, business,

-7-

and/or financial information that has not become public, the disclosure of which is likely to cause harm to the competitive position of the Disclosing Party. "CONFIDENTIAL – ATTORNEYS' EYES ONLY" information may include, without limitation: (i) technical information containing confidential information or items such as materials that show the internal technical structure, design or operation of products that have been made, imported, used, or sold by the producing party; (ii) financial and/or other commercially-sensitive information (e.g., pricing, customer lists, business, and/or marketing plans or analysis, license agreements, and the like); (iii) trade secrets; (iv) information subject to an obligation of confidentiality owed by the Producing Party to a third-party; and/or (v) information subject to the privacy interest of any individual. In determining whether information should be designated as "CONFIDENTIAL – ATTORNEYS' EYES ONLY," each party agrees to use such designation in good faith. For Protected Material designated CONFIDENTIAL – ATTORNEYS' EYES ONLY, access to, and disclosure of, such Protected Material shall be limited to individuals listed in paragraphs 6(a) and (c-g) who, at the time the lawsuit was filed (November 8, 2018) or within the previous two (2) years from the date the lawsuit was filed, are not competitive decision-makers of a Party or affiliates of a Party.

9.    **RESTRICTED CONFIDENTIAL SOURCE CODE.** For the Protected Material designated RESTRICTED CONFIDENTIAL SOURCE CODE, the following additional restrictions apply:

(a)    Access to a Party's Source Code Material shall be provided only on "stand-alone" computer(s) (that is, the computer may not be linked to any network, including a local area network ("LAN"), an intranet or the Internet).    The stand-alone computer(s) may be connected to a printer. Additionally, the stand-alone computer(s) may only be located at the offices of

the producing Party's outside counsel within the Central District of California;

(b) The receiving Party shall make reasonable efforts to restrict its requests for such access to the stand-alone computer(s) to normal business hours, which for purposes of this paragraph shall be 9:00am through 6:00pm.  The Parties agree to cooperate in good faith such that maintaining the producing Party's Source Code Material at the offices of its outside counsel shall not unreasonably hinder the receiving Party's ability to efficiently and effectively conduct the prosecution or defense of this Action;[1]

(c) The producing Party shall provide the receiving Party with information explaining how to start, log on to, and operate the stand-alone computer(s) in order to access the produced Source Code Material on the stand-alone computer(s);

(d) The producing Party will produce Source Code Material in computer searchable format on the stand-alone computer(s) as described above.  The receiving Party shall be permitted to take notes; any notes taken during inspection of source code or based upon inspection of source code, must be marked "RESTRICTED CONFIDENTIAL SOURCE CODE" and shall be treated as RESTRICTED CONFIDENTIAL SOURCE CODE under the terms of this Order.  Any such

---

[1] For the purposes of this paragraph, an outside consultant or expert is defined to include the outside consultant's or expert's direct reports and other support personnel, such that the disclosure to a consultant or expert who employs others within his or her firm to help in his or her analysis shall count as a disclosure to a single consultant or expert.

notes shall not count towards the limitations on printing pages set forth below in paragraph 8(h);

(e) The producing Party shall install tools that are sufficient for viewing and searching the source code produced, on the platform produced.  At a minimum, these tools must provide the ability to (1) view, search, and line-number any source file and (2) search for a given pattern of text through a number of files;

(f) Access to DESIGNATED MATERIAL designated RESTRICTED CONFIDENTIAL SOURCE CODE shall be limited to outside counsel of record who, at the time the lawsuit was filed (November 8, 2018) or within the previous two (2) years from the date the lawsuit was filed, are not competitive decision-makers of a Party or affiliates of a Party and up to one (1) outside consultant or expert (i.e., not existing employees or affiliates of a Party) retained for the purpose of this litigation and approved to access such Protected Materials pursuant to paragraph 5(c) above;

(g) To the extent portions of Source Code Material are quoted in a document containing source code (a "Source Code document"), either (1) the entire Source Code document will be stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE or (2) those pages containing quoted Source Code Material will be separately stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE;

(h) In no event may the receiving Party request printing of more than 15 consecutive pages and more than 200 pages of information in aggregate during the duration of the case

without prior agreement from the producing Party or further order of the Court.  If the receiving Party requires the printing of additional pages of source code beyond the limits stated herein, the parties agree to negotiate in good faith to determine the extent of any modification of these limits.  The receiving Party should provide the producing Party with specific identification of the Source Code Material it requests to be printed.  Printing of directory paths or structures and file names shall not count toward the consecutive or aggregate page count listed in this section;

(i) Except as set forth in paragraphs 8(l)-(m) below, no additional copies of Source Code Material shall be made without prior written consent of the producing Party, except as necessary to create documents which, pursuant to the Court's rules, procedures, and order, must be filed or served electronically;

(j) The receiving Party shall only request printing of those limited portions of the Source Code Material specifically necessary for a case activity (e.g., as evidence for trial or an exhibit for an expert's report). Counsel for the producing Party will keep the originals of all printed Source Code Material. Producing Party will produce a Bates-numbered copy of the originals of all printed Source Code Material to receiving Party within ten (10) business days of the request for printing.  The Parties will cooperate in good faith if a different timeframe for production is required;

(k) The producing Party shall print every page of Source Code Material in 12 point font and with information necessary to later identify that Source Code Material, such as, but not

-11-

1    limited to, a header or footer, that identifies the file name and

2    directory path;

3    (l)    Intentionally omitted;

4    (m)    If the receiving Party's outside counsel, consultants, or

5    experts obtain the printout of the Source Code Material, the

6    receiving Party shall ensure that such outside counsel,

7    consultants, or experts keep the printout in a secured locked

8    area in the offices of such outside counsel, consultants, or

9    expert; and

10    (n)    A producing Party's Source Code Material may only be

11    transported by the receiving Party at the direction of a person

12    authorized under paragraph 8(f) above to another person

13    authorized under paragraph 8(f) above, on paper via hand

14    carry, Federal Express, or other similarly reliable courier.

15    Source Code Material may not be transported or transmitted

16    electronically over a network of any kind, including a LAN,

17    an intranet, or the Internet.

18    10.    Nothing in this Order shall require production of documents,

19    information, or other material that a Party contends is protected from disclosure

20    by the attorney-client privilege, the work product doctrine, or other privilege,

21    doctrine, or immunity.  If documents, information, or other material subject to a

22    claim of attorney-client privilege, work product doctrine, or other privilege,

23    doctrine, or immunity is inadvertently or unintentionally produced, such

24    production shall in no way prejudice or otherwise constitute a waiver of, or

25    estoppel as to, any such privilege, doctrine, or immunity. Any Party that

26    inadvertently or unintentionally produces documents, information, or other

27    material it reasonably believes are protected under the attorney-client privilege,

28    work product doctrine, or other privilege, doctrine, or immunity may obtain the

1  return of such documents, information, or other material by promptly notifying
2  the recipient(s) and providing a privilege log for the inadvertently or
3  unintentionally produced documents, information, or other material.   The
4  recipient(s) shall gather and return all copies of such documents, information, or
5  other material to the producing Party, except for any pages containing privileged
6  or otherwise protected markings by the recipient(s), which pages shall instead be
7  destroyed and certified as such to the producing Party.

8        11.    The production of privileged or work-product protected
9  documents, electronically stored information ('ESI") or information, whether
10  inadvertent or otherwise, is not a waiver of the privilege or protection from
11  discovery in this case or in any other federal or state proceeding.  This Order shall
12  be interpreted to provide the maximum protection allowed by Federal Rule of
13  Evidence 502(d). Nothing contained herein is intended to or shall serve to limit a
14  party's right to conduct a review of documents, ESI, or information (including
15  metadata) for relevance, responsiveness, and/or segregation of privileged and/or
16  protected information before production.

17        12.    There shall be no disclosure of any DESIGNATED
18  MATERIAL by any person authorized to have access thereto to any person who
19  is not authorized for such access under this Order.   The Parties are hereby
20  ORDERED to safeguard all such documents, information, and material to protect
21  against disclosure to any unauthorized persons or entities.

22        13.    Nothing contained herein shall be construed to prejudice any
23  Party's right to use any DESIGNATED MATERIAL in taking testimony at any
24  deposition or hearing provided that the DESIGNATED MATERIAL is only
25  disclosed to a person(s) who is: (i) eligible to have access to the DESIGNATED
26  MATERIAL by virtue of his or her employment with the designating party, (ii)
27  identified in the DESIGNATED MATERIAL as an author, addressee, or copy
28  recipient of such information, (iii) although not identified as an author, addressee,

-13-

or copy recipient of such DESIGNATED MATERIAL, has, in the ordinary course of business, seen such DESIGNATED MATERIAL, (iv) a current or former officer, director, or employee of the producing Party or a current or former officer, director, or employee of a company affiliated with the producing Party; (v) counsel for a Party, including outside counsel and in-house counsel (subject to paragraph 8 of this Order); (vi) an independent contractor, consultant, and/or expert retained for the purpose of this litigation; (vii) court reporters and videographers; (viii) the Court; or (ix) other persons entitled hereunder to access DESIGNATED MATERIAL. DESIGNATED MATERIAL shall not be disclosed to any other persons unless prior authorization is obtained from counsel representing the producing Party or from the Court.

14.     Parties may, at the deposition or hearing or within thirty (30) days after receipt of a deposition or hearing transcript, designate the deposition or hearing transcript or any portion thereof as "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" pursuant to this Order. Access to the deposition or hearing transcript so designated shall be limited in accordance with the terms of this Order.   Until expiration of the 30-day period, the entire deposition or hearing transcript shall be treated as CONFIDENTIAL – ATTORNEYS' EYES ONLY.

15.     Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Information or Material. In the event a Party wishes to use DESIGNATED MATERIAL in any pleading, motion, or other paper filed with the Court in this litigation, such pleading, motion, or other paper and Confidential Material shall be filed under seal pursuant to L.R. 79-5 and other applicable rules of the Court.

-14-

16.     The Order applies to pretrial discovery.  Nothing in this Order shall be deemed to prevent the parties form introducing and DESIGNATED MATERIAL into evidence at the trial of this Action, or from using any information contained in DESIGNATED MATERIAL at the trial of this Action, subject to any pretrial order issued by this Court.

17.     A Party may request in writing to the other Party that the designation given to any DESIGNATED MATERIAL be modified or withdrawn. If the designating Party does not agree to re-designation within ten (10) business days of receipt of the written request, the requesting Party may apply to the Court for relief. Upon any such application to the Court, the burden shall be on the designating Party to show why its classification is proper. Such application shall be treated procedurally as a motion to compel pursuant to Federal Rules of Civil Procedure 37, subject to the Rule's provisions relating to sanctions. In making such application, the requirements of the Federal Rules of Civil Procedure and the Local Rules of the Court shall be met.  Pending the Court's determination of the application, the designation of the designating Party shall be maintained.

18.     Each outside consultant or expert to whom DESIGNATED MATERIAL is disclosed in accordance with the terms of this Order shall be advised by counsel of the terms of this Order, shall be informed that he or she is subject to the terms and conditions of this Order and shall sign an acknowledgement that he or she has received a copy of, has read, and has agreed to be bound by this Order. A copy of the acknowledgment form is attached as Exhibit A.

19.     To the extent that any discovery is taken of persons who are not Parties to this Action (i.e., "Third Parties") and in the event that such Third Parties contended the discovery sought involves trade secrets, confidential

-15-

1  business or technical information, or other proprietary information, then such

2  Third Parties may agree to be bound by this Order.

3        20.    To the extent that discovery or testimony is taken of Third

4  Parties, the Third Parties may designate as "CONFIDENTIAL" or

5  "CONFIDENTIAL – ATTORNEYS' EYES ONLY" any documents,

6  information, or other material, in whole or in part, produced or given by such

7  documents, information or other material, in whole or in part, produced or given

8  by such Third Parties. The Third Parties shall have ten (10) business days after

9  production of such documents, information, or other materials to make such a

10  designation. Until that time period lapses or until such a designation has been

11  made, whichever occurs sooner, all documents, information, or other material so

12  produced or given shall be treated as "CONFIDENTIAL – ATTORNEYS' EYES

13  ONLY" in accordance with this Order.

14        21.    Within thirty (30) days of final termination of this Action,

15  including any appeals, all DESIGNATED MATERIAL, including all copies,

16  duplicates, abstracts, indexes, summaries, descriptions, and excerpts, or extracts

17  thereof (excluding excerpt or extracts incorporated into any privileged

18  memoranda of the Parties and materials which have been admitted into evidence

19  in this Action), shall at the producing Party's election either be returned to the

20  producing Party or be destroyed. The receiving Party shall verify the return or

21  destruction by affidavit furnished to the producing Party, upon the producing

22  Party's request.

23        22.    The failure to designate documents, information, or material

24  in accordance with this Order and the failure to object to a designation at a given

25  time shall not preclude the filing of a motion at a later date seeking to impose

26  such designation or challenging the propriety thereof. The entry of this Order

27  and/or the production of documents, information, and material hereunder shall in

28

-16-

1   no way constitute a waiver of any objection to the furnishing thereof, all such

2   objections being hereby preserved.

3       23.    Any Party knowing or believing that any other party is in

4   violation of or intends to violate this Order and has raised the question of

5   violation or potential violation with the opposing party and has been unable to

6   resolve the matter by agreement may move the Court for such relief as may be

7   appropriate in the circumstances. Pending disposition of the motion by the Court,

8   the Party alleged to be in violation of or intending to violate this Order shall

9   discontinue performance of and/or shall not undertake the further performance of

10  any action alleged to constitute a violation of this Order.

11      24.    Production of DESIGNATED MATERIAL by each of the

12  Parties shall not be deemed a publication of the documents, information, and

13  material (or the contents thereof) produced so as to void or make voidable

14  whatever claim the Parties may have as to the proprietary and confidential nature

15  of the documents, information, or other material or its contents.

16      25.    Nothing in this Order shall be construed to effect an

17  abrogation, waiver, or limitation of any kind on the rights of each of the Parties

18  to assert any applicable discovery or trial privilege.

19      26.    Nothing in this Order shall prevent or otherwise restrict

20  outside counsel of record from rendering advice to their clients and, in the course

21  of rendering such advice, relying upon the examination of DESIGNATED

22  MATERIAL subject to paragraphs 7 and 8 of this Order. In rendering such advice

23  and otherwise communicating with the client, however, counsel shall not disclose

24  or reveal the substance or content of any DESIGNATED MATERIAL, except as

25  permitted by this Order.

26      27.    Each of the Parties shall also retain the right to file a motion

27  with the Court (a) to modify this Order to allow disclosure of DESIGNATED

28  MATERIAL to additional persons or entities if reasonably necessary to prepare

1  and present this Action and (b) to apply for additional protection of
2  DESIGNATED MATERIAL.

3  After the adoption of this provision by the parties, Outside Counsel
4  representing a Party and any person associated with a Party who receive a
5  producing Party's Protected Material designated "CONFIDENTIAL –
6  ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE
7  CODE" under this Protective Order who accesses or otherwise learns of, in whole
8  or in part, said Protected Material designated "CONFIDENTIAL –
9  ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE
10 CODE" under this Protective Order shall not prepare, prosecute, supervise,
11 advise, counsel, or assist in the preparation or prosecution of any patent
12 application seeking a patent on behalf of the receiving Party or its acquirer,
13 successor, or predecessor in the field of pulse oximetry during the pendency of
14 this Action and for two years after final termination of this action.  To avoid any
15 doubt, "prosecution" as used in this paragraph does not include representing or
16 advising a Party before a domestic or foreign agency in connection with a reissue
17 protest, ex parte reexamination, covered business method review, or *inter partes*
18 review; though in connection with any such reissue protest, ex parte
19 reexamination, covered business method review, or *inter partes* review involving
20 the patents-in-suit, Outside counsel for a receiving Party shall not: (i) participate
21 in the preparation, prosecution, supervision, advice, counsel, or assistance of any
22 amended claims; (ii) reveal a producing Party's Protected Material to any
23 prosecuting reexamination counsel or agent; or (iii) use a producing Party's
24 Protected Material for any purpose other than this litigation.  The applicability of
25 this provision is to be determined on an individual-by-individual basis such that
26 an individual attorney who has not received Protected Material designated
27 "CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "RESTRICTED
28 CONFIDENTIAL SOURCE CODE" is not restricted from undertaking any

1    activities by virtue of this provision even if said individual attorney is employed

2    by or works for the same firm or organization as an individual who has received

3    such Protected Material.

4

5        IT IS SO ORDERED.

6

7    DATED: April 02, 2020

8

9                           JOHN D. EARLY
                                 United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

MASIMO CORPORATION, a
Delaware Corporation; and
CERCACOR LABORATORIES, INC.,
a Delaware corporation,

        Plaintiffs/Counterdefendants,

v.

TRUE WEARABLES, INC., a
Delaware corporation; and MARCELO
LAMEGO, an individual,

        Defendants/Counterclaimants.

Civil Action No. 8:18-cv-2001-JVS-JDE

**AGREEMENT TO BE BOUND BY PROTECTIVE ORDER**

I, _____,
declare that:

    1.    My address is _____
_____. My current
employer is _____. My
current occupation is _____.

    2.    I have received a copy of the Protective Order in this action. I have
carefully read and understand the provisions of the Protective Order.

    3.    I will comply with all of the provisions of the Protective Order.  I
will hold in confidence, will not disclose to anyone not qualified under the

-1-

1    Protective Order, and will use only for purposes of this action any information

2    designated as "CONFIDENTIAL," "CONFIDENTIAL – ATTORNEYS' EYES

3    ONLY" or "RESTRICTED CONFIDENTIAL SOURCE CODE" that is

4    disclosed to me.

5        4.       Promptly upon termination of these actions, I will return all

6    documents and things designated as "CONFIDENTIAL," "CONFIDENTIAL –

7    ATTORNEYS' EYES ONLY" or "RESTRICTED CONFIDENTIAL SOURCE

8    CODE" that came into my possession, and all documents and things that I have

9    prepared relating thereto, to the outside counsel for the party by whom I am

10   employed.

11       5.       I hereby submit to the jurisdiction of this Court for the purpose of

12   enforcement of the Protective Order in this action.

13

14       I declare under penalty of perjury that the foregoing is true and correct.

15

16

17   Signature _____

18

19   Date _____

20

21

22

23

24

25

26

27

28

-2-

# ADDENDUM 2

Joseph R. Re (Bar No. 134479)
joseph.re@knobbe.com
Stephen C. Jensen (Bar No. 149894)
stephen.jensen@knobbe.com
Irfan A. Lateef (Bar No. 204004)
irfan.lateef@knobbe.com
Brian C. Claassen (Bar No. 253627)
brian.claassen@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Telephone:  (949)-760-0404
Facsimile:  (949)-760-9502

Attorneys for Plaintiffs,
**Masimo Corporation and**
**Cercacor Laboratories, Inc.**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MASIMO CORPORATION, a Delaware corporation; and CERCACOR LABORATORIES, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> TRUE WEARABLES, INC., a Delaware corporation; and MARCELO LAMEGO, an individual, <br><br> Defendants. | Case No. 8:18-CV-02001 <br><br> **COMPLAINT FOR** <br> **(1) BREACH OF CONTRACT** <br> **(2) TRADE SECRET** <br> **  MISAPPROPRIATION** <br> **(3) BREACH OF FIDUCIARY DUTY** <br> **  AND** <br> **(4) PATENT INFRINGEMENT** <br><br> **AND DEMAND FOR JURY TRIAL** |

Plaintiffs MASIMO CORPORATION ("Masimo") and CERCACOR LABORATORIES, INC. ("Cercacor") hereby complain of Defendants TRUE WEARABLES, INC. ("True Wearables") and MARCELO LAMEGO ("Lamego") (collectively, "Defendants"), and allege as follows:

## I. THE PARTIES

1.  Plaintiff Masimo is a Delaware corporation having its principal place of business at 52 Discovery, Irvine, California 92618.

2.  Plaintiff Cercacor is a Delaware corporation having its principal place of business at 40 Parker, Irvine, California 92618.

3.  Plaintiffs Masimo and Cercacor formerly employed Defendant Lamego as a highly-trusted engineer.

4.  Lamego is now the founder, CEO, and Chairman of the Board of Defendant True Wearables.  True Wearables is a relatively new company that recently began selling Oxxiom, a pulse oximeter apparently intended to compete directly with Plaintiffs' products.

5.  On information and belief, Defendant Lamego resides at 18 Lyra Way, Coto de Caza, California 92679 and Defendant True Wearables is a Delaware corporation having a principal place of business at 29826 Avenida de Las Banderas, Suite 300, Rancho Santa Margarita, California 92688.

## II. JURISDICTION AND VENUE

6.  This civil action includes claims for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq.*, more particularly, 35 U.S.C. §§ 271 and 281.  This action also arises under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836(b)-(c).  This Complaint further alleges breach of contract, trade secret misappropriation, and breach of fiduciary duty.

7.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367(a).

-1-

8. Defendant Lamego resides in California. Defendant True Wearables has its principal place of business in California. Both Defendants are subject to personal jurisdiction in California and have committed the acts complained of in this Judicial District. The relevant agreements between Plaintiffs and Lamego also include consent to personal jurisdiction in California.

9. Venue is proper in the Southern Division of the Central District of California pursuant to 28 U.S.C. § 1400(b) with respect to patent infringement because Lamego resides in, and True Wearables has its regular and established place of business in, the County of Orange within the Central District of California. Defendants also have committed acts of infringement in this Judicial District. Venue is also appropriate in this Judicial District under U.S.C. § 1391(b) with respect to the DTSA claims.

### III. STATEMENT OF THE CASE

10. This action seeks relief for the theft of Plaintiffs' highly confidential information and trade secrets, and infringement of Masimo's patents by Lamego and True Wearables. Lamego betrayed Plaintiffs' trust by acquiring and wrongfully using their highly confidential and proprietary technical information, product plans, manufacturing knowledge, and other highly confidential information. Lamego also breached his agreements with Plaintiffs by using and disclosing Plaintiffs' confidential information. This action also seeks relief for Lamego's breach of his fiduciary duty to Cercacor.

### IV. STATEMENT OF FACTS

11. Masimo is a medical technology company that revolutionized pulse oximetry and is the only company to have succeeded in developing certain other noninvasive patient monitoring technologies. Pulse oximetry is a noninvasive method for monitoring a person's arterial oxygen saturation (also called "$SpO_2$") and pulse rate from a sensor that is attached to a user. Before Masimo,

-2-

1  pulse oximetry was plagued by unreliability, often when the measurement was
2  needed most, due to patient motion and low peripheral blood flow (known as
3  "low perfusion").    The industry had essentially given up on solving this
4  problem, concluding it was largely unsolvable.  Clinicians had to live with the
5  results – patient monitors gave excessive false alarms, froze their measurements
6  for prolonged periods of time despite potential changes in oxygen saturation or
7  pulse rate, delayed notification of alarms due to long averaging times of sensor
8  data, produced inaccurate measurements, or were unable to obtain data on the
9  most critical patients and babies who cannot be instructed to stay still.
10  Masimo's pioneering technology, known as Masimo Signal Extraction
11  Technology ("Masimo SET"), solved this problem and dramatically improved
12  patient safety by accurately monitoring and reporting oxygen saturation and
13  pulse rate even during motion and low perfusion.

14      12.    Following its success in pulse oximetry, Masimo subsequently
15  invested in developing additional breakthrough measurement technologies, such
16  as  non-invasively  measuring  total  hemoglobin,  carboxyhemoglobin,  and
17  methemoglobin.  Masimo has continued to innovate, succeeding where others
18  have consistently failed.  Masimo was the first, and remains the only, company
19  delivering these game-changing technologies to hospitals in the United States.

20      13.    From its inception, Masimo has continuously developed cutting-
21  edge noninvasive patient monitoring technologies.  Masimo sought and received
22  numerous U.S. patents for many of its inventions in this area.    Masimo's
23  revolutionary technology was a key to its gaining significant market praise and
24  penetration.  After introduction into the market, many competitors, much larger
25  than Masimo, used Masimo's technology without a license, resulting in patent
26  infringement lawsuits that ultimately confirmed the validity of Masimo's
27  innovations.    But, Masimo does not pursue patents on all its innovations.
28  Masimo maintains some technology as trade secrets.   In addition, Masimo

-3-

1  guards its future product and market plans. Only select employees have
2  knowledge of and access to these guarded secrets.

3      14.   Masimo's innovations also include important advances in sensor
4  technologies that complement Masimo's system and algorithms. Masimo's
5  sensors are integral to the success of the revolutionary technologies Masimo has
6  developed. Masimo also pioneered techniques to manufacture sensors with low
7  waste and low cost, while still providing high quality and exacting
8  specifications. These sensor manufacturing techniques have been critical to
9  Masimo's innovation engine and success for many years.

10     15.   In 1998, Masimo spun certain technology off into a new company,
11 Masimo Laboratories, Inc. or "Masimo Labs," to further research and develop
12 the technologies. The name of the company was later changed to "Cercacor."
13 Cercacor and Masimo have a license agreement between them to facilitate
14 confidential collaboration between the companies.

15     16.   Like Masimo, Cercacor is an innovator of non-invasive monitoring
16 technologies. Cercacor is on the frontline of understanding how measuring,
17 tracking, and analyzing physiological parameters can impact pre-diabetic and
18 diabetic patients, endurance sports training and performance and overall health
19 and wellness. Cercacor continued the development that started at Masimo on
20 total hemoglobin (SpHb), methemoglobin (SpMet), and carboxyhemoglobin
21 (SpCO®) and other non-invasive parameters.

22     17.   Leading hospitals around the world use Cercacor technology
23 licensed to Masimo and sold under the name Masimo rainbow SET. Like
24 Masimo, Cercacor does not pursue patents on all its innovations. Cercacor also
25 maintains some technology as trade secrets, and guards its future product and
26 market plans. Only select employees have knowledge of and access to these
27 guarded secrets.

28 / / /

18.    Masimo and Cercacor carefully guard the secrecy of their confidential information and documents.  For example, Masimo and Cercacor have policies regarding labelling confidential information and documents as "CONFIDENTIAL AND PROPRIETARY." They also restrict these documents and information from disclosure to third parties and employees on a need-to-know basis.  Masimo and Cercacor also have policies in place regarding the use of computers and related equipment that govern how their computer systems may be used.   Those policies also govern the protection of Masimo's and Cercacor's confidential information.    Both Masimo and Cercacor have document management systems that restrict access to confidential documents to only those employees with proper security credentials and a need for access. Masimo and Cercacor also require employees to sign agreements precluding the employees from disclosing or making use of any confidential information except as authorized by Masimo and Cercacor and as necessary for the performance of the employees' duties.  Masimo and Cercacor implemented such policies and procedures to maintain the confidentiality of sensitive information. These polices were in place during Lamego's employment and remain in place today.

19.    When Lamego started at Masimo, he was not skilled in physiological monitoring and had no exposure to manufacturing techniques. However, Masimo ultimately came to believe, after some time, that he had the technical capability to excel.  He had exhibited what appeared to be high integrity and qualities of trustworthiness.  Accordingly, Masimo ultimately decided to allow Masimo's key engineers who developed Masimo's revolutionary technology to disclose it to Lamego.  Masimo believed that, by allowing these key engineers to disclose the secrets of Masimo's technologies, Lamego could eventually take over for Masimo's chief scientist. To accomplish this, Masimo arranged to have Lamego shadow these engineers, and expose him

1     to every aspect of Masimo's technology, including top-secret algorithms,
2     proprietary circuit board manufacturing, confidential sensor designs and much
3     more. The engineers disclosed the extensive secrets that underlie Masimo
4     technology and Masimo gave Lamego unfettered access to its most highly
5     confidential technical information. Masimo groomed Lamego to continue this
6     development with the access he had been given to the top engineers at Masimo.

7         20. In addition to revealing the secrets of Masimo's technology,
8     Masimo exposed Lamego to Masimo's plans with respect to future products and
9     market plans. Through this exposure, Masimo disclosed to Lamego what
10    technologies Masimo believed would be significant and successful in those
11    markets.

12        21. Masimo's founder, Chairman and CEO, also disclosed to Lamego
13    Masimo's know-how and trade secrets regarding his strategic vision of non-
14    invasive monitoring, managing an R&D organization, and strategic product and
15    marketing plans. Indeed, Masimo's founder had regular one-on-one meetings
16    with Lamego to disclose Masimo's know-how and trade secrets to him.

17        22. Lamego started with Masimo in 2000 as an Algorithm Engineer,
18    initially staying less than one year. At that time, Lamego agreed to and signed a
19    Masimo Employee Confidentiality Agreement (the "Masimo 2000 Agreement")
20    dated June 26, 2000. A copy of the Masimo 2000 Agreement is attached hereto
21    as Exhibit 1. Among the terms of the Masimo 2000 Agreement are the
22    following:

23         a. "For purposes of this Agreement, the term Confidential
24        Information means any information in any form that Masimo considers
25        confidential, including business plans, customer files, sales and marketing
26        reports, technical data, prices and costs, designs and formulas, software,
27        databases, personnel and payroll records, mailing lists, accounting
28        records, and other business information."

-6-

b.     "During my employment by Masimo, I will not disclose or make use of any Confidential Information except as authorized by Masimo and as necessary for the performance of my duties as a Masimo employee."

c.     "After my employment with Masimo has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business."

d.     "Upon termination of my employment for any reason, I will immediately assemble all property of Masimo in my possession or under my control and return it unconditionally to Masimo."

e.     "During my employment, I will devote all of my working time and energy to the business of Masimo, and I will not render services to anyone outside Masimo, accept competing employment, or make preparations to compete with Masimo."

f.     "During and after my employment, I will not solicit or induce any employee or consultant of Masimo to quit their employment or cease doing business with Masimo...."

g.     "For purposes of enforcing this Agreement, I hereby consent to jurisdiction in the Superior Court of California for the County of Orange, as well as any other jurisdiction allowed by law."

h.     "I understand that my obligations under this Agreement remain in effect even after my employment with Masimo terminates."

23.    When he started in 2000, Lamego was not familiar with pulse oximetry product development.    Masimo's key engineers began training Lamego on Masimo's pulse oximetry technology, from basic principles to sophisticated Masimo algorithms and approaches.

24.    Lamego left Masimo for a short period from January 2001 to December 2002 to work as a consultant and professor.    Lamego returned to

-7-

Masimo in January 2003, as a Research Scientist, and held that position until November 2006.

25.     Upon re-joining Masimo, Lamego signed a second agreement with Masimo dated January 28, 2003 with provisions similar to his first agreement. A copy of the 2003 Agreement is attached hereto as Exhibit 2.  The 2003 Agreement further confirmed, "I agree to assign and hereby assign to Masimo all rights that I may have to any inventions, works of authorship, developments, improvements, or trade secrets that I may develop during the course of my employment, except for inventions which I am allowed to retain under California Labor Code section 2870, a copy of which is attached to this Agreement as Exhibit B."

26.     Masimo's most trusted and skilled engineers continued to expose Lamego to Masimo's technology.  As Lamego became more immersed in Masimo's technology, Masimo gave Lamego access to the most confidential of information that was restricted to only a very small number of Masimo's trusted engineers.  Masimo's chief scientist spent significant time over the years disclosing to Lamego Masimo's technical know-how and trade secrets.  To accelerate this process, Masimo's chief scientist shared an office with Lamego for years, disclosing everything he could about Masimo technology.  Masimo expected Lamego would eventually succeed Masimo's chief scientist.

27.     In his trusted position, Masimo exposed Lamego to Masimo's future product and market plans.  Lamego was a senior member of a team that was developing SpHb, SpMet, SpCO, and other non-invasive parameters.  He was also part of a team developing a plan to pursue un-tethered, wearable monitoring solutions and wireless sensors, whereby the patient or user would no longer be connected by a wire to a monitor.  Masimo had begun its strategic plans for wireless sensors and wearable monitors, and Lamego was privy to those discussions and plans.  Those plans also included developing wearable

-8-

1    devices, including wireless sensors and wearable monitors, and marketing those
2    products outside of the medical field, for example, to athletes and health
3    conscious consumers. Lamego was personally involved in strategic discussions
4    on both the marketing and product plans for wireless sensors and wearable
5    monitors and the planned target markets. These plans were not generally
6    known.

7        28.    Lamego signed a third agreement with Masimo dated January 31,
8    2005. A copy of the 2005 Agreement is attached hereto as Exhibit 3. The 2005
9    Agreement also added:

10            a.    "For purposes of this Agreement, the term Confidential
11        Information means any information in any form that Masimo considers
12        confidential, including without limitation business plans, customer files,
13        sales and marketing reports, technical data, prices and costs, designs and
14        formulas, software, databases, personnel and payroll records, mailing
15        lists, accounting records, and other business information. Confidential
16        Information also includes information to which I am exposed during the
17        course of my employment with Masimo that is considered confidential to
18        Masimo's affiliates or any third party."

19            b.    "Upon termination of my employment for any reason, I will
20        immediately assemble all property of Masimo in my possession or under
21        my control and return it unconditionally to Masimo.

22            c.    "I agree that the fruits and products of my labor as a Masimo
23        employee shall belong solely to Masimo."

24            d.    "I agree that the activities forbidden in paragraphs 13 and 14
25        above would necessarily involve the use or disclosure of Masimo's trade
26        secrets and proprietary and confidential information . . . and are necessary
27        to protection of Masimo's trade secrets and proprietary and confidential
28        information. I understand that none of my activities will be prohibited

-9-

1
2
3

under paragraphs 13 and 14 to the extent that I can prove that the action was taken without the use or disclosure of any of Masimo's trade secrets or proprietary or confidential information.

4   29.   In 2006, Lamego, having received extensive exposure to Masimo's
5   confidential information from Masimo's key engineers, moved from Masimo to
6   Masimo Labs. Lamego was promoted to Chief Technical Officer of Masimo
7   Labs. With this promotion, he became the most senior ranking executive
8   engineer of Masimo Labs. Masimo Labs' mission was to continue developing
9   non-invasive technologies using the technology originally developed at
10  Masimo, which was licensed to Masimo Labs. Masimo Labs focused on the
11  market outside of the professional medical caregiver market with these new
12  innovative technologies.

13  30.   Masimo Labs was also working to measure glucose levels in the
14  blood non-invasively. As CTO, Lamego led all Masimo Labs' technology
15  development. He was also involved in, exposed to, and responsible for carrying
16  out strategic plans for products and markets, including for wearable monitors
17  and wireless sensors, and target markets for those products.

18  31.   While at Masimo Labs, Lamego signed an Employee
19  Confidentiality Agreement (the "Cercacor Agreement") dated May 19, 2009. A
20  copy of the Cercacor Agreement is attached hereto as Exhibit 4. Among the
21  terms of the Cercacor Agreement are the following:

22  a.   "For purposes of this Agreement, the term Confidential
23  Information means any information in any form that Masimo Labs
24  considers confidential, including without limitation business plans,
25  customer files, customer lists, supplier lists, sales and marketing reports,
26  forecasts, strategies, technical data, prices and costs, designs and
27  formulas, discoveries, processes, manufacturing techniques, know-how,
28  improvements, ideas or copyrightable works, software, databases,

-10-

personnel and payroll records, mailing lists, accounting records, works of authorship, inventions, trade secrets and other business information. Confidential Information also includes information to which I am exposed during the course of my employment with Masimo Labs that is considered confidential to Masimo Labs' affiliates or any third party."

b.   "During my employment by Masimo Labs, I will not disclose or make use of any Confidential Information except as authorized by Masimo Labs and as necessary for the performance of my duties as a Masimo Labs employee."

c.   "After my employment with Masimo Labs has terminated, I will not disclose or make use of any Confidential Information for any purpose, either on my own or on behalf of another business."

d.   "Upon termination of my employment for any reason, I will immediately assemble all property of Masimo Labs, including any proprietary or confidential information, in my possession or under by control and return it unconditionally to Masimo Labs."

e.   "During my employment, I will devote all of my working time and energy to the business of Masimo Labs, and I will not render services to anyone outside Masimo Labs, accept competing employment, or make preparations to compete with Masimo Labs."

f.   "I agree that the activities forbidden in paragraphs 13 and 14 above would necessarily involve the use or disclosure of Masimo Labs' trade secrets and proprietary and confidential information and are necessary to protection of Masimo Labs' trade secrets or activities."

g.   "For purposes of enforcing this Agreement, I hereby consent to jurisdiction in the Superior Court of California for the County of Orange, as well as any other jurisdiction allowed by law."

/ / /

-11-

h.    "I understand that my obligations under this Agreement remain in effect even after my employment with Masimo Labs terminates."

32.    The Masimo 2000 Agreement, 2003 Agreement, 2005 Agreement, and the Cercacor 2009 Agreement are collectively referred to herein as the "Lamego Agreements."

33.    At Masimo Labs, later renamed Cercacor, Lamego's understanding of Plaintiffs' confidential information continued to develop regarding, among other things, the construction of physiological sensors, how to manufacture high-quality sensors to exacting specifications at a reasonable cost, how to process signals based on light transport through physiological tissue, and photon diffusion.  He continued to be Cercacor's most-trusted engineer with unrestricted access to Masimo's and Cercacor's confidential information.  In his executive role at Cercacor, he was further closely involved in the strategic future plans of Masimo and Cercacor on many topics, including Masimo plans to enter certain markets and particular technologies that would likely be successful.  He was also introduced to potential suppliers relating to components for wireless sensors and untethered monitors.

34.    In his role at Cercacor, Lamego led the engineering team and Cercacor's research and product development.  With regular guidance provided by the CEO, Lamego managed and directed all technical activities, including developing product roadmaps, project management, intellectual property strategy, recruitment of employees, negotiation of supplier agreements and non-disclosure agreements, modeling, hardware development, algorithm design, software implementation, biosensor development, and industrial design. Lamego also participated in many discussions about the development of a wireless sensor and other wireless configurations for Plaintiffs. Masimo and Cercacor disclosed their vast pulse oximetry sensor technology, including

-12-

1  processing of signals based on light transport through physiological tissue, and
2  photon diffusion while he worked. Masimo also disclosed manufacturing
3  techniques for producing pulse oximetry sensors with reasonable cost
4  constraints. As former Chief Technical Officer of Cercacor and a Research
5  Scientist at Masimo, he had unfettered access to and responsibility for
6  maintaining Plaintiffs' highly confidential technical information.

7      35. Lamego resigned from Cercacor in January 2014, after having
8  sought, and obtained, a position at Apple, Inc. Lamego learned of Apple's
9  interest and heavy recruiting of Masimo's technical and clinical team, including
10 soliciting Masimo's key engineers. Apple's recruitment included the key
11 engineers that Lamego knew intimately understood Masimo's technology.
12 Apple also solicited and succeeded in hiring Masimo's Chief Medical Officer,
13 Michael O'Reilly, who as a Masimo executive, was also intimately familiar
14 with Masimo's strategic product and marketing plans. Lamego was aware of
15 Masimo's and Cercacor's concerns about Apple pursuing key team members.
16 On information and belief, Lamego then sought and obtained a position from
17 Apple. Shortly after joining Apple, Lamego pursued on behalf of Apple
18 numerous patent applications on some of the same technologies as disclosed in
19 Masimo's patents.

20     36. When Lamego informed Masimo and Cercacor that he was leaving
21 for Apple, Lamego proactively volunteered to Masimo and Cercacor that he
22 would not work on pulse oximetry and other technologies he had worked on
23 while with Masimo or Cercacor. He assured Plaintiffs that if Apple asked him
24 to do so, he would quit. Yet, he continued such work on his own after leaving
25 Apple.

26     37. Although only at Apple for seven months, Lamego was listed as an
27 inventor in multiple Apple-filed patent applications that were closely tied to the
28 work he had done and the technology he had been taught by Masimo's key

-13-

1  scientists.  Based on those now-published patent applications, Masimo and
2  Cercacor now understand that while at Apple, Lamego worked as an engineer
3  on development of non-invasive physiological measurements, including pulse
4  oximetry, for Apple for wearable products, directly in conflict with his
5  assurances to Masimo and Cercacor.

6  38.  After seven months, Lamego's employment at Apple ended.  He
7  then founded True Wearables.  In late 2016, Plaintiffs cautioned Lamego that
8  his activity raised significant concerns about his obligations to Plaintiffs.
9  Lamego contended that the products he was developing for True Wearables did
10  not rely on Plaintiffs' confidential information.  But, Lamego refused to share
11  with Plaintiffs' outside counsel the Oxxiom hardware or software.  On
12  information and belief, Lamego later released his Oxxiom device with its
13  software fully encrypted.

14  39.  Lamego also was aware of Masimo's and Cercacor's ongoing
15  projects for wearable wireless devices, and indeed, Lamego oversaw such
16  projects at Cercacor.  Plaintiffs' plans, known to Lamego, were not generally
17  known outside of Plaintiffs.

18  40.  After True Wearables introduced its Oxxiom product to market,
19  Plaintiffs unfortunately confirmed the concerns raised by Lamego and True
20  Wearables that were identified in the Plaintiffs' letters.

21  41.  Lamego never sought any type of permission or rights from
22  Plaintiffs to use their confidential information, trade secrets or other intellectual
23  property.

24  42.  Before Lamego left Cercacor, he claimed to have proven the
25  feasibility of measuring glucose and multiple other blood constituents non-
26  invasively.  He assured Cercacor's CEO that he had transferred all know-how
27  for these measuring these blood constituents to others at Cercacor.  Because of
28  the unexpected departure of Lamego, Cercacor revisited the feasibility studies

-14-

1   and could not demonstrate feasibility of any of the measurements. Accordingly,

2   either Lamego withheld from Cercacor information critical to the development

3   of the technology for these parameters or misrepresented their feasibility.

4       43.   Lamego also recruited onto Defendant True Wearables' Board

5   another former Masimo executive, Anthony Allan, previously Chief Operating

6   Officer at Masimo. Allan was in charge of manufacturing at Masimo, and had

7   access to extensive know-how regarding Masimo's manufacturing, such as how

8   to manufacture disposable and reusable pulse oximetry sensors, to exacting

9   specifications, at a reasonable cost with low waste.

### V. FIRST CAUSE OF ACTION

### (BREACH OF CONTRACT WITH MASIMO BY LAMEGO)

12       44.   Masimo hereby realleges and incorporates by reference the

13   allegations set forth in paragraphs 1 through 43.

14       45.   The covenants in the Masimo 2000 Agreement, 2003 Agreement,

15   and 2005 Agreement (collectively, "Masimo Agreements") were intended and

16   necessary to protect Plaintiffs' legitimate business interests in its goodwill and

17   confidential information.

18       46.   The Masimo Agreements are valid and enforceable contracts

19   between Masimo and Lamego.

20       47.   Because of the Masimo Agreements, Lamego had an obligation to

21   keep confidential and not to disclose or to make use of any of Masimo's

22   confidential information, except as authorized by Masimo and as necessary for

23   the performance of his duties as an employee of Masimo.

24       48.   Because of the Masimo Agreements, Lamego also had an

25   obligation not to disclose or to make use of any Masimo confidential

26   information, for any purpose, either on his own or on behalf of another business

27   after his employment with Masimo had terminated.

28   ///

49. Masimo breached the Masimo Agreements by taking and using Masimo's confidential information for his own benefit and for the benefit of True Wearables. On information and belief, Lamego continues to breach the Masimo Agreements by wrongfully utilizing Masimo's confidential information to the benefit of others and in the course of his employment with True Wearables.

50. Because of the Masimo Agreements, Lamego also had an obligation to cooperate with Masimo to do whatever necessary or appropriate to obtain patents.

51. Lamego breached the Masimo Agreements by failing to cooperate with Masimo by failing to pursue the patenting of certain subject matter he was instructed to pursue, as well as by refusing to review and sign inventor declarations and assignments for continuing patent applications on which he was a named inventor. Masimo suffered harm as a result, including attorneys' fees and expenses.

52. Masimo has fully performed all its obligations and has satisfied all conditions for performance under the Masimo Agreement.

53. Lamego has willfully, and with conscious disregard for the contractual obligations owed to Masimo, breached the Masimo Agreements.

54. Unless restrained and enjoined by the Court, Lamego will continue to breach the Masimo Agreements.

55. As a foreseeable, direct, and proximate result of Lamego's breach of contract, Masimo has suffered irreparable injury to their rights and pecuniary damages. Masimo will continue to suffer such injury, loss, and damage unless and until Lamego is enjoined from further use or disclosure of Masimo's confidential information.

56. Lamego has derived and received and will continue to derive and to receive from the aforementioned breach of contract, gains, profits, and

1    advantages, many of which are not presently known to Masimo. As a result,
2    Lamego should be required to disgorge these gains, profits, and advantages in
3    restitution for his breach.

4    57.    Masimo is therefore entitled to injunctive relief or specific
5    performance of the Masimo Agreements.

### VI. SECOND CAUSE OF ACTION

### (BREACH OF CONTRACT WITH CERCACOR BY LAMEGO)

8    58.    Plaintiffs hereby reallege and incorporate by reference the
9    allegations set forth in paragraphs 1 through 57.

10    59.    The covenants in the Cercacor Agreement were intended and
11    necessary to protect Cercacor's legitimate business interests in its goodwill and
12    confidential information.

13    60.    The Cercacor Agreement is a valid and enforceable contract
14    between Cercacor and Lamego.

15    61.    Because of the Cercacor Agreement, Lamego had an obligation to
16    keep confidential and not to disclose or to make use of any of Cercacor's
17    confidential information, except as authorized by Cercacor and as necessary for
18    the performance of his duties as an employee of Cercacor.

19    62.    Because of the Cercacor Agreement, Lamego also had an
20    obligation not to disclose or to make use of any Plaintiffs' confidential
21    information, for any purpose, either on his own or on behalf of another business
22    after his employment with Cercacor had terminated.

23    63.    Lamego breached the Cercacor Agreement by taking and using
24    Cercacor's confidential information for his own benefit and for the benefit of
25    True Wearables. On information and belief, Lamego continues to breach the
26    Cercacor Agreements by wrongfully utilizing Plaintiffs' confidential
27    information to the benefit of others and in the course of his employment with
28    True Wearables.

-17-

64. Lamego also breached the Cercacor Agreement by taking and using Cercacor's trade secrets to compete directly with Cercacor. Cal. Bus. & Prof. Code § 16600 generally prohibits agreements forbidding former employees from engaging in work for a competitor. However, courts in California have recognized a trade secrets exception to Section 16600. *See Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748, 758 (9th Cir. 2008). Lamego agreed with Cercacor "for a period of two (2) years immediately following my termination of employment with Masimo Labs (voluntary or otherwise), I shall be prohibited from competing with any business, product or service of Masimo Labs." Ex. 4 at ¶14. Lamego also agreed that this was necessary to protect trade secrets. *See* Ex. 4 at ¶15. Lamego and True Wearables compete directly with Cercacor, using Cercacor trade secrets, in violation of the terms of the Cercacor Agreement.

65. Because of the Cercacor Agreement, Lamego also had an obligation to cooperate with Cercacor to do whatever necessary or appropriate to obtain patents.

66. Lamego breached the Cercacor Agreement by failing to cooperate with Cercacor by failing to pursue the patenting of certain subject matter he was instructed to pursue, as well as by refusing to review and sign inventor declarations and assignments for continuing patent applications on which he was a named inventor. Cercacor suffered harm as a result, including attorneys' fees and expenses.

67. Lamego also breached the Cercacor Agreement by not disclosing sufficient information regarding glucose and the other non-invasive parameters he claimed to have proven feasibility of at Cercacor, or in the alternative, not accurately presenting the status of their development.

68. Cercacor has fully performed all its obligations and have satisfied all conditions for performance under the Cercacor Agreement.

-18-

69. Lamego has willfully, and with conscious disregard for the contractual obligations owed to Plaintiffs, breached the Cercacor Agreement.

70. Unless restrained and enjoined by the Court, Lamego will continue to breach the Cercacor Agreement.

71. As a foreseeable, direct, and proximate result of Lamego's breach of contract, Cercacor has suffered irreparable injury to their rights and pecuniary damages. Cercacor will continue to suffer such injury, loss, and damage unless and until Lamego is enjoined from further use or disclosure of Cercacor's confidential information.

72. Lamego has derived and received and will continue to derive and to receive from the aforementioned breach of contract, gains, profits, and advantages, many of which are not presently known to Cercacor. As a result, Lamego should be required to disgorge these gains, profits, and advantages in restitution for his breach.

73. Cercacor is therefore entitled to injunctive relief or specific performance of the Cercacor Agreement.

## VII. **THIRD CAUSE OF ACTION**
## **(TRADE SECRET MISAPPROPRIATION UNDER**
## **CALIFORNIA'S UNIFORM TRADE SECRET LAW)**

74. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 73.

75. This is a cause of action for Misappropriation of Trade Secrets under California's Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426 *et seq*., based upon Defendants' wrongful and improper use and disclosure of confidential and proprietary trade secret information of Plaintiffs.

76. Plaintiffs own the trade secrets including, but not limited to, Plaintiffs' business plans, know-how, technical information, technical data, designs, manufacturing techniques and other business information ("Confidential

*1*   Information").

*2*   77.    Plaintiffs' Confidential Information is currently, and was at the time
*3*   of Defendants' misappropriation, not generally known. All individuals with access
*4*   to Plaintiffs' Confidential Information were instructed to keep it confidential, and
*5*   they were subject to obligations to keep Plaintiffs' Confidential Information
*6*   secret.  Additionally, Plaintiffs' Confidential Information is not generally known
*7*   to the public or to other persons who can obtain economic value from its
*8*   disclosure or use.

*9*   78.    Plaintiffs' Confidential Information has actual and potential
*10*   independent economic value because it is not generally known.  The actual and
*11*   potential independent economic value of Plaintiffs' Confidential Information is
*12*   derived from not being generally known because it gives Plaintiffs an actual and
*13*   potential business advantage over others who do not know the information and
*14*   who could obtain economic value from its disclosure or use.

*15*   79.    Plaintiffs made reasonable efforts under the circumstances to keep
*16*   Plaintiffs' Confidential Information from becoming generally known.    For
*17*   example, Plaintiffs' efforts included marking documents confidential, instructing
*18*   those individuals with access to the information to treat it as confidential,
*19*   restricting access to the information, and requiring individuals to sign
*20*   confidentiality agreements.

*21*   80.    Plaintiffs are informed and believe, and thereon alleges, that Lamego
*22*   misappropriated Plaintiffs' Confidential Information by disclosure.    On
*23*   information and belief, Lamego disclosed Plaintiffs' Confidential Information,
*24*   without Plaintiffs' consent, to True Wearables, True Wearables' employees, and
*25*   True Wearables' contractors in order for them improperly develop the Oxxiom
*26*   product.  Additionally, at the time of disclosure, Lamego knew or had reason to
*27*   know that his knowledge of Plaintiffs' Confidential Information was acquired by
*28*   an employer-employee and fiduciary relationship and Lamego's employment

-20-

1  agreements, which created a duty for Lamego to keep Plaintiffs' Confidential
2  Information secret.

3       81.   Plaintiffs are informed and believe, and thereon allege, that
4  Defendants also misappropriated Plaintiffs' Confidential Information by use.  On
5  information and belief, Lamego used Plaintiffs' Confidential Information in
6  deciding to form True Wearables, in identifying the target market, the products to
7  pursue, and during Lamego's employment at True Wearables, without Plaintiffs'
8  express or implied consent, for True Wearables to identify the target market, target
9  product, and to develop and manufacture pulse oximetry product.

10       82.   Plaintiffs are informed and believe, and thereon allege, that True
11  Wearables also misappropriated Plaintiffs' Confidential Information by
12  disclosure.  On information and belief, True Wearables disclosed Plaintiffs'
13  Confidential Information, without Plaintiffs' consent, in order to improperly
14  develop and manufacture the pulse oximetry devices.  True Wearables knew or
15  had reason to know that his knowledge of Plaintiffs Confidential Information
16  came from Plaintiffs, and that Lamego had previously acquired Plaintiff's
17  Confidential Information by virtue of an employer-employee and fiduciary
18  relationship and the Lamego agreements, all of which created a duty for Lamego
19  to keep Plaintiffs' Confidential Information secret.

20       83.   Plaintiffs are informed and believe, and thereon allege, that
21  Defendants misappropriated Plaintiffs' Confidential Information by acquisition
22  because True Wearables obtained possession of Plaintiffs' Confidential
23  Information from Lamego, when True Wearables knew or had reason to know that
24  Lamego used improper means to acquire it.  Additionally, True Wearables used
25  improper means to acquire Lamego's Confidential Information from Lamego
26  because True Wearables relied on Lamego's breach of his duty not to use
27  Plaintiffs' Trade Secrets.  Lamego acquired the trade secrets by improper means.
28  Additionally, at the time of acquisition, Lamego knew or had reason to know that

his knowledge of Plaintiffs' Confidential Information came from Plaintiffs and that Lamego had previously acquired Plaintiffs' Confidential Information by virtue of an employer-employee and fiduciary relationship and the Lamego agreements, all of which created a duty for Lamego to protect and not use Plaintiffs' Confidential Information.

84.    Plaintiffs were harmed by Defendants' acquisition, use, and disclosure of Plaintiffs' Confidential Information, and Defendants' actions were substantial factors in causing Plaintiffs' harm. As a direct and proximate result of Defendants' willful, improper, and unlawful acquisition, use, and disclosure of Plaintiffs' trade secrets, Plaintiffs have suffered, and will continue to suffer, great harm and damage. Plaintiffs will continue to be irreparably damaged unless Defendants are enjoined from further use and disclosure of Plaintiffs Confidential Information.

85.    Defendants were unjustly enriched by Defendants' acquisition, use, and disclosure of Plaintiffs' Confidential Information, and Defendants' actions were substantial factors in causing Defendants to be unjustly enriched. Defendants were unjustly enriched because their misappropriation of Plaintiffs' Confidential Information caused Defendants to receive a benefit that they otherwise would not have achieved.

86.    If neither damages nor unjust enrichment caused by Defendants' misappropriation of Plaintiffs' Confidential Information is provable at trial, Plaintiffs are entitled to a reasonable royalty for the period of time that Defendants' use of Plaintiffs' Confidential Information could have been prohibited.

87.    The aforementioned acts of Defendants in wrongfully misappropriating Plaintiffs trade secrets were, and continue to be, willful and malicious, warranting an award of reasonable attorneys' fees, as provided by Cal. Civ. Code § 3426.4, and exemplary damages, as provided by Cal. Civ. Code

-22-

1 §§ 3294 and 3426.3(c).

2 ## VIII.  **FOURTH CAUSE OF ACTION**

3 ## **(TRADE SECRET MISAPPROPRIATION UNDER THE FEDERAL**
4 ## **DEFENSE OF TRADE SECRETS ACT)**

5 88.    Plaintiffs hereby reallege and incorporate by reference the
6 allegations set forth in paragraphs 1 through 87.

7 89.    This is a cause of action for Misappropriation of Trade Secrets under
8 the Federal Defense of Trade Secrets Act of 2016, 18 U.S.C. §§ 1836 *et seq.*,
9 based upon Defendants' wrongful and improper use of confidential and
10 proprietary trade secret information of Plaintiffs.

11 90.    Plaintiffs own the trade secrets including, but not limited to, the
12 Confidential Information previously described.

13 91.    Plaintiffs' Confidential Information is currently, and was at the time
14 of Defendants' misappropriation, secret.  All individuals with access to Plaintiffs'
15 Confidential Information were instructed to protect it, and they were subject to
16 obligations to keep Plaintiffs' Confidential Information secret.   Additionally,
17 Plaintiffs' Confidential Information is not generally known to the public or to
18 other persons who can obtain economic value from its disclosure or use.
19 Plaintiffs' Confidential Information is not readily ascertainable by the public or to
20 other persons.

21 92.    Plaintiffs' Confidential Information has actual and potential
22 independent economic value because it is not generally known.  The actual and
23 potential independent economic value of Plaintiffs' Confidential Information is
24 derived from not being generally known because it gives Plaintiffs an actual and
25 potential business advantage over others who do not know the information and
26 who could obtain economic value from its disclosure or use.

27 / / /

28 / / /

93.    Plaintiffs made reasonable efforts under the circumstances to keep Plaintiffs' Confidential Information secret.    For example, Plaintiffs' efforts included marking documents confidential, instructing those individuals with access to the information to treat it as confidential, restricting access to the information, and requiring individuals with access to the information to sign confidentiality agreements.

94.    Plaintiffs are informed and believe, and thereon allege, that True Wearables misappropriated Plaintiffs' Confidential Information by use.    True Wearables' unauthorized use of Plaintiff's Confidential Information has occurred after the enactment of the DTSA in May 2016, and such unauthorized and improper use is ongoing and continues to this day.

95.    On information and belief, Lamego disclosed Plaintiffs' Confidential Information, without Plaintiffs' consent, to True Wearables and to True Wearables' employees for them improperly develop the Oxxiom product.    True Wearables used Plaintiffs' Confidential Information, without Plaintiffs' express or implied consent, improperly to pursue the concept, and to identify the target market, identify the target product and develop and manufacture the Oxxiom device.    On information and belief, True Wearables used Plaintiffs' Confidential Information, without Plaintiffs' consent, by choosing the target market, choosing the target product, and advertising and releasing True Wearables Oxxiom product. Additionally, at the time of disclosure, True Wearables knew or had reason to know that Lamego's knowledge of Plaintiffs' Confidential Information was acquired by virtue of an employer-employee and fiduciary relationship and Lamego's employment agreements, which created a duty for Lamego to protect Plaintiffs' Confidential Information.

96.    On information and belief, Defendants also used Plaintiffs' Confidential Information during Lamego's employment at True Wearables, without Plaintiffs' express or implied consent, in order for True Wearables to

1  identify the target market, the target product, and develop and manufacture the
2  Oxxiom product.

3      97.    Plaintiffs' are informed and believe, and thereon allege, that
4  Defendants misappropriated Plaintiffs' Confidential Information by acquisition
5  because True Wearables obtained possession of Plaintiffs' Confidential
6  Information from Lamego, when True Wearables knew or had reason to know that
7  Lamego used improper means to acquire it.  Additionally, True Wearables used
8  improper means to acquire Lamego's Confidential Information from Lamego
9  because True Wearables relied on Lamego's breach of his duty not to use
10  Plaintiffs' Trade Secrets.

11      98.    Plaintiffs were harmed by Defendants' acquisition, use, and
12  disclosure of Plaintiffs' Trade Secrets, and Defendants' actions were substantial
13  factors in causing Plaintiffs' harm.  As a direct and proximate result of
14  Defendants' willful, improper, and unlawful acquisition, use, and disclosure of
15  Plaintiffs' trade secrets, Plaintiffs have suffered, and will continue to suffer, great
16  harm and damage.  Plaintiffs will continue to be irreparably damaged unless
17  Defendants are enjoined from further use and disclosure of Plaintiffs' Trade
18  Secrets.

19      99.    Defendants were unjustly enriched by Defendants' acquisition, use,
20  and disclosure of Plaintiffs' Trade Secrets, and Defendants' actions were
21  substantial factors in causing Defendants to be unjustly enriched.  Defendants
22  were unjustly enriched because their misappropriation of Plaintiffs' Trade Secrets
23  caused Defendants to receive a benefit that they otherwise would not have
24  achieved.

25      100.  In the event that neither damages nor unjust enrichment caused by
26  Defendants' misappropriation of Plaintiffs' Trade Secrets is provable at trial,
27  Plaintiffs are entitled to a reasonable royalty for the period of time that
28  Defendants' use of Plaintiffs' trade secrets could have been prohibited.

-25-

101.  The aforementioned acts of Defendants in wrongfully misappropriating Plaintiffs trade secrets were, and continue to be, willful and malicious, warranting an award of reasonable attorneys' fees, as provided by 18 U.S.C. § 1836(b)(3)(D), and exemplary damages, as provided by 18 U.S.C. § 1836(b)(3)(C).

## IX.  FIFTH CAUSE OF ACTION
## (BREACH OF FIDUCIARY DUTY OF UNDIVIDED LOYALTY AGAINST LAMEGO)

102.  Cercacor hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 101.

103.  As an officer of Cercacor, Lamego owed duties of loyalty and other fiduciary duties to Cercacor, including the duty not to exploit his position within Cercacor's corporate structure for his own benefit and the duty not to hinder or usurp Cercacor's corporate opportunities.

104.  While serving as Cercacor's Chief Technical Officer, Lamego oversaw research and development into technology for the noninvasive measurement of over twenty additional blood parameters.

105.  Lamego failed to pursue patent subject matter he was instructed to pursue.  Although filing patents that appeared to relate to the subject matter, Lamego excluded certain subject matter for which he was instructed to seek patent protection.

106.  In 2013, Lamego represented to the Cercacor Board of Directors that many non-invasive parameters were feasible and available for license to Masimo.

107.  Cercacor revisited the feasibility studies for these parameters after Lamego's unexpected departure, but could not confirm their feasibility.  Either Lamego failed to fully disclose information critical to their feasibility, in breach of his fiduciary duty or he did not accurately represent the status, also in breach of his fiduciary duty.  To the extent that Lamego did not accurately present to Cercacor

-26-

*1* and its Board of Directors the status of his research and development into the
*2* technology for non-invasively measuring those blood parameters, or failed to fully
*3* disclose the developed technology, Lamego breached his duty of undivided
*4* loyalty.

*5*      108.   Based on Lamego's representations, in December 2013, Masimo
*6* licensed the Lamego-developed technology to noninvasively measure five of those
*7* blood parameters and paid Cercacor a license fee of $2,500,000.

*8*      109.   Lamego acted against Cercacor's interests by either not accurately
*9* presenting the status of at least the five parameters ultimately licensed by Masimo,
*10* or by failing to disclose sufficient information to Cercacor regarding feasibility of
*11* the technology for the parameters before his departure from Cercacor at the end of
*12* 2013.   Indeed, Lamego did not maintain notebooks or sufficient records at
*13* Cercacor.

*14*      110.   Following Lamego's departure from Cercacor, Cercacor was unable
*15* to transfer the technology to Masimo in a manner that allowed successful
*16* development of a product.   Cercacor revisited the testing of the Lamego-
*17* developed technology and ultimately determined it could not show feasibility
*18* sufficient to maintain the license to Masimo.

*19*      111.   Cercacor suffered financial harm as a result, refunding the
*20* $2,500,000 license fee to Masimo and the expense of substantial resources to
*21* develop the technology Lamego oversaw.   Lamego's failure in his duties to
*22* Cercacor was a substantial factor in causing Cercacor's harm.

*23*                    **X. THE PATENTS-IN-SUIT**

*24*      112.   Masimo is the owner by assignment of U.S. Patent No. 8,983,564
*25* entitled "Perfusion Index Smoother" ("the '564 patent"), which the United
*26* States Patent and Trademark Office lawfully and duly issued on March 17,
*27* 2015. A true and correct copy of the '564 patent is attached hereto as Exhibit 5.
*28* / / /

-27-

1       113. Masimo is the owner by assignment of U.S. Patent No. 8,886,271

2 entitled "Non-Invasive Physiological Sensor Cover" ("the '271 patent"), which

3 the United States Patent and Trademark Office lawfully and duly issued on

4 November 11, 2014. A true and correct copy of the '271 patent is attached

5 hereto as Exhibit 6.

6       114. Masimo is the owner by assignment of U.S. Patent No. 7,295,866

7 entitled "Low Power Pulse Oximeter" ("the '866 patent"), which the United

8 States Patent and Trademark Office lawfully and duly issued on November 13,

9 2007. A true and correct copy of the '866 patent is attached hereto as Exhibit 7.

10      115. Masimo is the owner by assignment of U.S. Patent No. 7,186,966

11 entitled "Amount of Use Tracking Device and Method for Medical Product"

12 ("the '966 patent"), which the United States Patent and Trademark Office

13 lawfully and duly issued on March 6, 2007. A true and correct copy of the '966

14 patent is attached hereto as Exhibit 8.

15      116. Masimo is the owner by assignment of U.S. Patent No. 10,194,847

16 entitled "Perfusion Index Smoother" ("the '847 patent"), which the United

17 States Patent and Trademark Office lawfully and duly issued on February 5,

18 2019. A true and correct copy of the '847 patent is attached hereto as Exhibit

19 10.

20      117. Masimo is the owner by assignment of U.S. Patent No. 10,194,848

21 entitled "Non-Invasive Physiological Sensor Cover" ("the '848 patent"), which

22 the United States Patent and Trademark Office lawfully and duly issued on

23 February 5, 2019. A true and correct copy of the '848 patent is attached hereto

24 as Exhibit 11.

## XI. SIXTH CAUSE OF ACTION

## (INFRINGEMENT OF U.S. PATENT NO. 8,983,564)

27      118. Plaintiffs hereby reallege and incorporate by reference the

28 allegations set forth in paragraphs 1 through 117.

-28-

119.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 1-3 of the '564 patent under at least 35 U.S.C. § 271(a), (b), and (c).

120.   Upon information and belief, True Wearables has directly infringed one or more claims of the '564 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

121.   For example, upon information and belief, in operation, the Oxxiom device and its corresponding Oxxiom application perform all of the limitations of Claim 2 of the '564 patent.  The Oxxiom device and application determine an indication of perfusion index, displayed on the Oxxiom application and labeled as "PI" as shown in the image below found on True Wearables website at https://www.truewearables.com/:



After approximately 15 seconds, SpO2, PR, and PI measurements are displayed continuously

122.   The Oxxiom device receives plethysmograph ("pleth") data based on a signal received from a detector contained in an Osram SFH7050, a component within the Oxxiom device.  On information and belief, the Oxxiom device and application use pleth data to determine $SpO_2$, pulse rate, and perfusion index.  Lamego further describes the Oxxiom device and application

-29-

in a patent application he filed that published as U.S. Patent Application Publication 2018/0110450 on April 26, 2018.  A copy of the publication is attached as Exhibit 9.  That publication describes that the Oxxiom device receives pleth data and processes it, for example in Fig. 24 and the corresponding text.

123.  The Oxxiom device and/or application determine an indication of perfusion index by utilizing at least one of a first calculation technique and a second calculation technique to determine a resulting indication of perfusion index.  As shown above in the image, the Oxxiom application displays a resulting indication of perfusion index.  On information and belief, when the Oxxiom device is tapped or rubbed while attached to a user, the perfusion index readings demonstrate the use of at least two different perfusion index calculation techniques.

124.  On information and belief, the Oxxiom device also determines the indication of perfusion index by choosing a calculation technique that will result in a lower perfusion index value.  For example, when the Oxxiom device is tapped or rubbed, the perfusion index readings demonstrate the choice of a calculation technique resulting in the lowest perfusion index value.

125.  Upon information and belief, Lamego and True Wearables have knowledge of Masimo's patents, including the '564 patent at least based on Lamego's former positions with Masimo and Cercacor.  Masimo filed the patent application that led to the '564 patent on September 26, 2012 and it published on March 28, 2014, both while Lamego was employed by Cercacor as Chief Technical Officer and oversaw Cercacor's IP strategy.  Upon further information and belief, through the knowledge of the '564 patent gained by monitoring Masimo's patents, Lamego and True Wearables knew or should have known that these activities would infringe.  True Wearables also had knowledge of the '564 patent no later than the filing of this Complaint.

126. Upon information and belief, True Wearables has actively induced others to infringe the '564 patent by marketing and selling the above Oxxiom device, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '564 patent. To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the '564 patent. True Wearables' acts constitute infringement of the '564 patent in violation of 35 U.S.C. § 271(b).

127. Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '564 patent. By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '564 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device. Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

128. Upon information and belief, True Wearables' acts constitute contributory infringement of the '564 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom device that constitute material parts of the invention of the asserted claims of the '564 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '564 patent.

129. Upon information and belief, True Wearables' infringement of the '564 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '564 patent and

1    its infringement thereof, thus acting in reckless disregard of Masimo's patent

2    rights.

3       130. Because of True Wearables' infringement of the '564 patent,

4    Masimo has suffered and will continue to suffer irreparable harm and injury,

5    including monetary damages in an amount to be determined at trial.

6       131. Upon information and belief, unless enjoined, True Wearables,

7    and/or others acting on behalf of True Wearables, will continue their infringing

8    acts, thereby causing additional irreparable injury to Masimo for which there is

9    no adequate remedy at law.

10                **XII.  SEVENTH CAUSE OF ACTION**

11       **(INFRINGEMENT OF U.S. PATENT NO. 8,886,271)**

12       132. Plaintiffs hereby reallege and incorporate by reference the

13    allegations set forth in paragraphs 1 through 131.

14       133. Upon information and belief, True Wearables' products, including

15    at least the Oxxiom pulse oximeter, infringe at least Claims 1-2, 6-11, and 15-18

16    of the '271 patent under at least 35 U.S.C. § 271(a), (b), and (c).

17       134. Upon information and belief, True Wearables has directly infringed

18    one or more claims of the '271 patent through manufacture, use, sale, offer for

19    sale, and/or importation into the United States of pulse oximeters, including the

20    Oxxiom device.

21       135. For example, upon information and belief, the Oxxiom includes all

22    of the limitations of Claim 10 of the '271 patent. The Oxxiom device has a

23    sensor cover, including "tab 2," for use with a noninvasive optical physiological

24    sensor, the Oxxiom. The sensor cover comprises all the limitations of Claim 10.

25    It includes an opaque portion attachable to the sensor and configured to block

26    optical readings by the sensor, as shown in the instructions from the True

27    Wearables website (https://www.truewearables.com/), reproduced below:

28    / / /

"Tab 2" also includes a non-adhesive portion that protrudes from the sensor to facilitate removal of the sensor cover, as showing in the depiction above. Furthermore, the Oxxiom device is a sensor that includes a light source configured to emit light from one or more emitters of the sensor and a detector configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site. The Oxxiom device includes a light source that has multiple emitters, the multiple LEDs contained in an Osram SFH7050. That same Osram SFH7050 includes a detector that is configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site. The opaque portion of "Tab 2" is configured to prevent the detector from receiving light during sensor activation, as shown in the instructions above.

136. Upon information and belief, Lamego and True Wearables have knowledge of Masimo's patents, including the '271 patent at least based on Lamego's former position with Cercacor. The inventors filed the patent application that led to the '271 patent on June 17, 2013, while Lamego was employed by Cercacor as Chief Technical Officer and oversaw IP strategy. Upon further information and belief, through the knowledge of the '271 patent gained by monitoring Masimo's patents, True Wearables knew or should have known that these activities would cause direct infringement. True Wearables

1    also had knowledge of the '271 patent no later than the filing of this Complaint.

2       137.   Upon information and belief, True Wearables has actively induced

3    others to infringe the '271 patent by marketing and selling the above Oxxiom

4    devices, knowing and intending that such systems would be used by customers

5    and end users in a manner that infringes the '271 patent.   To that end, True

6    Wearables provides instructions and teachings to its customers and end users

7    that such Oxxiom devices be used to infringe the '271 patent.   True Wearables'

8    acts constitute infringement of the '271 patent in violation of 35 U.S.C.

9    § 271(b).

10      138.   Upon information and belief, True Wearables actively induces

11   users to directly infringe the asserted claims of the '271 patent.   By way of

12   example only, upon information and belief, Oxxiom actively induces direct

13   infringement of the '271 patent by providing directions, demonstrations, guides,

14   manuals, training for use, and/or other materials necessary for the use of the

15   Oxxiom device.   Upon information and belief, True Wearables knew or should

16   have known that these activities would cause direct infringement.

17      139.   Upon information and belief, True Wearables' acts constitute

18   contributory infringement of the '271 patent in violation of 35 U.S.C. § 271(c).

19   Upon information and belief, True Wearables contributorily infringes because,

20   among other things, True Wearables offers to sell and/or sells within the United

21   States, and/or imports into the United States, components of the Oxxiom that

22   constitute material parts of the invention of the asserted claims of the '271

23   patent, are not staple articles or commodities of commerce suitable for

24   substantial non-infringing use, and are known by True Wearables to be

25   especially made or especially adapted for use in an infringement of the '271

26   patent.

27      140.   Upon information and belief, True Wearables' infringement of the

28   '271 patent has been, and continues to be, willful, deliberate, and intentional by

1 continuing its acts of infringement after becoming aware of the '271 patent and

2 its infringement thereof, thus acting in reckless disregard of Masimo's patent

3 rights.

4     141. As a consequence of True Wearables' infringement of the '271

5 patent, Masimo has suffered and will continue to suffer irreparable harm and

6 injury, including monetary damages in an amount to be determined at trial.

7     142. Upon information and belief, unless enjoined, True Wearables,

8 and/or others acting on behalf of True Wearables, will continue their infringing

9 acts, thereby causing additional irreparable injury to Masimo for which there is

10 no adequate remedy at law.

11               **XIII.  EIGHTH CAUSE OF ACTION**

12      **(INFRINGEMENT OF U.S. PATENT NO. 7,295,866)**

13     143. Plaintiffs hereby reallege and incorporate by reference the

14 allegations set forth in paragraphs 1 through 142.

15     144. Upon information and belief, True Wearables' products, including

16 at least the Oxxiom pulse oximeter, infringe at least Claims 10-12 of the '866

17 patent under at least 35 U.S.C. § 271(a), (b), and (c).

18     145. Upon information and belief, True Wearables has directly infringed

19 one or more claims of the '866 patent through manufacture, use, sale, offer for

20 sale, and/or importation into the United States of pulse oximeters, including the

21 Oxxiom device.

22     146. For example, upon information and belief, the Oxxiom device

23 includes all of the limitations of Claim 10 of the '866 patent. The Oxxiom

24 device is a pulse oximeter capable of varying its power consumption,

25 comprising all of the elements of Claim 10. The Oxxiom device includes an

26 emitter driver, a Texas Instruments AFE4403. The Texas Instruments AFE4403

27 contains an integrated dual LED driver. The emitter driver of the Oxxiom

28 device outputs a drive signal capable of driving at least one emitter of a sensor,

1  contained in an Osram SFH7050, that detects energy attenuated by tissue of a
2  measurement site of a patient.

3      147.  The Oxxiom also includes a controller, a Nordic Semiconductor
4  nRF51422 system on a chip device with a Bluetooth transceiver, input/output
5  interfaces, memory, and a processor.  The Nordic chip, as configured in the
6  Oxxiom device, uses at least a first duty cycle of the drive signal corresponding
7  to a first power consumption and a second duty cycle of the drive signal
8  corresponding to a second power consumption different than the first power
9  consumption.  For example, the data sheet for the Texas Instruments AFE4403
10  explains that the device contains a configurable timing controller, controllable
11  through a serial interface (SPI) to the Nordic Semiconductor nRF51422.  On
12  information and belief, through the serial interface, the Nordic Semiconductor
13  nRF51422 configures the Texas Instruments AFE4403 to switch between duty
14  cycles corresponding to two different power consumptions.

15      148.  Further description of the Oxxiom device is found in Exhibit 9, the
16  patent application filed by Lamego that published on April 26, 2018.  That
17  publication describes many aspects of the Oxxiom device.  For example, at
18  paragraph 71, the publication states "FIG. 37 shows the typical workflow,
19  advantages, and technical specifications of a wireless, fully disposable, single-
20  use continuous clinical-grade oximeter (OXXIOM™) according to an
21  embodiment of these inventions."  The publication specifically identifies the
22  Osram SFH7050 at paragraph 95, the Nordic nRF51422 at paragraph 101, and
23  the Texas Instruments AFE4403 at paragraph 88.  The publication at paragraph
24  88 further confirms that "If the preferred low-cost low-power pulse oximeter
25  front[-]end from Texas Instruments, AFE4403 is used as the instrumentation
26  electronics [], then it can be programmed to generate and control directly the
27  required LED modulation scheme without additional resources from the sensor
28  processor []."  Figures 34A-C and paragraph 89 explain that "Modulations as

1  shown in FIG. 34A can also be adopted in the case of measurement sites with

2  low perfusion and/or subject to excessive motion." This description is

3  consistent with the operation of the Oxxiom device.

4      149. Upon information and belief, Lamego and True Wearables have

5  knowledge of Masimo's patents, including the '866 patent at least based on

6  Lamego's former positions with Masimo and Cercacor. The '866 patent issued

7  in November 2007, while Lamego was employed by Cercacor as Chief

8  Technical Officer and supervised IP strategy. Upon further information and

9  belief, through the knowledge of the '866 patent gained by monitoring

10  Masimo's patents, True Wearables knew or should have known that these

11  activities would cause direct infringement. True Wearables also had knowledge

12  of the '866 patent no later than the filing of this Complaint.

13      150. Upon information and belief, True Wearables has actively induced

14  others to infringe the '866 patent by marketing and selling the above Oxxiom

15  devices, knowing and intending that such systems would be used by customers

16  and end users in a manner that infringes the '866 patent. To that end, True

17  Wearables provides instructions and teachings to its customers and end users

18  that such Oxxiom devices be used to infringe the '866 patent. True Wearables'

19  acts constitute infringement of the '866 patent in violation of 35 U.S.C.

20  § 271(b).

21      151. Upon information and belief, True Wearables actively induces

22  users to directly infringe the asserted claims of the '866 patent. By way of

23  example only, upon information and belief, Oxxiom actively induces direct

24  infringement of the '866 patent by providing directions, demonstrations, guides,

25  manuals, training for use, and/or other materials necessary for the use of the

26  Oxxiom device. Upon information and belief, True Wearables knew or should

27  have known that these activities would cause direct infringement.

28  / / /

-37-

152.   Upon information and belief, True Wearables' acts constitute contributory infringement of the '866 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom device that constitute material parts of the invention of the asserted claims of the '866 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '866 patent.

153.   Upon information and belief, True Wearables' infringement of the '866 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '866 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

154.   Because of True Wearables' infringement of the '866 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

155.   Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XIV.  NINTH CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 7,186,966)

156.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 155.

157.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 1, 4, 15, and 19 of

-38-

1   the '966 patent under at least 35 U.S.C. § 271(a), (b), and (c).

2       158.  Upon information and belief, True Wearables has directly infringed
3   one or more claims of the '966 patent through manufacture, use, sale, offer for
4   sale, and/or importation into the United States of pulse oximeters, including the
5   Oxxiom device.

6       159.  For example, upon information and belief, the Oxxiom device and
7   its application perform all of the limitations of Claim 1.  The Oxxiom device is a
8   noninvasive probe, and the Oxxiom and its application track the amount of use
9   of the electronics of the Oxxiom device.  The application alerts a caregiver
10  when the electronics have expired.

11      160.  The Oxxiom device and its application determine a cumulative
12  amount of use of the noninvasive probe, the Oxxiom device.  The Oxxiom
13  device includes a plurality of emitters, including the red and infrared LEDs
14  located in an Osram SFH7050 on the Oxxiom device.  The same Osram
15  SFH7050 also contains a detector capable of detecting light attenuated by tissue.
16  These features are further described in Lamego's published patent application
17  regarding the Oxxiom, Ex. 9 at paragraph 106.

18      161.  On information and belief, when the cumulative amount of use
19  exceeds a predetermined amount of time, twenty-four hours, the Oxxiom
20  application activates one or more indications, including a red "X" displayed on
21  the battery icon in the application, conveying that the noninvasive optical probe
22  has expired.

23      162.  Upon information and belief, Lamego and True Wearables have
24  knowledge Masimo's patents, including the '966 patent at least based on
25  Lamego's former positions with Masimo and Cercacor.  The '966 patent issued
26  in March 2007, while Lamego was employed by Cercacor as Chief Technical
27  Officer and supervised IP strategy.  Upon further information and belief,
28  through the knowledge of the '966 patent gained by monitoring Masimo's

patents, True Wearables knew or should have known that these activities would cause direct infringement. True Wearables also had knowledge of the '966 patent no later than the filing of this Complaint.

163. Upon information and belief, True Wearables has actively induced others to infringe the '966 patent by marketing and selling the above Oxxiom devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '966 patent. To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the '966 patent. True Wearables' acts constitute infringement of the '966 patent in violation of 35 U.S.C. § 271(b).

164. Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '966 patent. By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '966 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device. Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

165. Upon information and belief, True Wearables' acts constitute contributory infringement of the '966 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom device that constitute material parts of the invention of the asserted claims of the '966 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '966 patent.

166.   Upon information and belief, True Wearables' infringement of the '966 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '966 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

167.   Because of True Wearables' infringement of the '966 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

168.   Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

### XV.  TENTH CAUSE OF ACTION
### (INFRINGEMENT OF U.S. PATENT NO. 10,194,847)

169.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 168.

170.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe at least Claims 1-4 of the '847 patent under at least 35 U.S.C. § 271(a), (b), and (c).

171.   Upon information and belief, True Wearables has directly infringed one or more claims of the '847 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

172.   For example, upon information and belief, in operation, the Oxxiom device and its corresponding Oxxiom application perform all of the limitations of Claim 4 of the '847 patent.   In use, the Oxxiom device and application determine an indication of a physiological condition (e.g., perfusion index), which is displayed on the Oxxiom application and labeled "PI," as

shown in the image below found on True Wearables website at https://www.truewearables.com/:



After approximately 15 seconds, SpO2, PR, and PI measurements are displayed continuously

173.   The Oxxiom device determines an indication of pulse information based on intensity signals acquired from a detector (e.g., pleth data) contained in an Osram SFH7050, a component within the Oxxiom device.   On information and belief, the Oxxiom device and application use pleth data to determine $SpO_2$, pulse rate, and perfusion index.   Lamego further describes the Oxxiom device and application in a patent application he filed that published as U.S. Patent Application Publication 2018/0110450 on April 26, 2018.   A copy of the publication is attached as Exhibit 9.   That publication describes that the Oxxiom device receives pleth data and processes it, for example in Fig. 24 and the corresponding text.

174.   The Oxxiom device and/or application software determines first and second indications of amplitude from the pleth data, which it uses to determine a final indication of amplitude based on a signal quality indication and a statistical analysis of the first and second indications of amplitude.   The Oxxiom application then outputs the final indication of amplitude as an indication of perfusion index, as shown in the image above.

/ / /

175.   Upon information and belief, True Wearables has actively induced others to infringe the '847 patent by marketing and selling the above Oxxiom device, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '847 patent.   To that end, True Wearables provides instructions and teachings to its customers and end users that such Oxxiom devices be used to infringe the '847 patent.   True Wearables' acts constitute infringement of the '847 patent in violation of 35 U.S.C. § 271(b).

176.   Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '847 patent.   By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '847 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device.   Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

177.   Upon information and belief, True Wearables' acts constitute contributory infringement of the '847 patent in violation of 35 U.S.C. § 271(c).   Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom device that constitute material parts of the invention of the asserted claims of the '847 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '847 patent.

178.   Upon information and belief, True Wearables' infringement of the '847 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '847 patent and

its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

179.   Because of True Wearables' infringement of the '847 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

180.   Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

## XVI.  **ELEVENTH CAUSE OF ACTION**
## **(INFRINGEMENT OF U.S. PATENT NO. 10,194,848)**

181.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 180.

182.   Upon information and belief, True Wearables' products, including at least the Oxxiom pulse oximeter, infringe all of the claims of the '848 patent (Claims 1-29) under at least 35 U.S.C. § 271(a), (b), and (c).

183.   Upon information and belief, True Wearables has directly infringed one or more claims of the '848 patent through manufacture, use, sale, offer for sale, and/or importation into the United States of pulse oximeters, including the Oxxiom device.

184.   For example, upon information and belief, the Oxxiom includes all of the limitations of Claim 9 of the '848 patent.  The Oxxiom device includes both a cover portion configured to be adhered to a pulse oximeter sensor and removed before use, and a protruding portion (Tab "2") that facilitates removal of the sensor cover, as shown in the Oxxiom User Guide available on the True Wearables website (https://www.truewearables.com/), reproduced and annotated below:

///



The cover portion of the sensor cover on the Oxxiom device covers the sensing components of the pulse oximeter sensor, as shown above. The Oxxiom device includes a sensor that includes a light source configured to emit light from one or more emitters of the sensor and a detector configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site. The Oxxiom device includes a light source that has multiple emitters, the multiple LEDs contained in an Osram SFH7050. That same Osram SFH7050 includes a detector that is configured to receive at least a portion of the light emitted by the one or more emitters after the light has passed through a tissue site. The cover portion of the sensor cover blocks at least a portion of light from the emitters from being received by the detector.

185. Upon information and belief, True Wearables has actively induced others to infringe the '848 patent by marketing and selling the above Oxxiom devices, knowing and intending that such systems would be used by customers and end users in a manner that infringes the '848 patent. To that end, True Wearables provides instructions and teachings to its customers and end users

that such Oxxiom devices be used to infringe the '848 patent. True Wearables' acts constitute infringement of the '848 patent in violation of 35 U.S.C. § 271(b).

186. Upon information and belief, True Wearables actively induces users to directly infringe the asserted claims of the '848 patent. By way of example only, upon information and belief, Oxxiom actively induces direct infringement of the '848 patent by providing directions, demonstrations, guides, manuals, training for use, and/or other materials necessary for the use of the Oxxiom device. Upon information and belief, True Wearables knew or should have known that these activities would cause direct infringement.

187. Upon information and belief, True Wearables' acts constitute contributory infringement of the '848 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, True Wearables contributorily infringes because, among other things, True Wearables offers to sell and/or sells within the United States, and/or imports into the United States, components of the Oxxiom that constitute material parts of the invention of the asserted claims of the '848 patent, are not staple articles or commodities of commerce suitable for substantial non-infringing use, and are known by True Wearables to be especially made or especially adapted for use in an infringement of the '848 patent.

188. Upon information and belief, True Wearables' infringement of the '848 patent has been, and continues to be, willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '848 patent and its infringement thereof, thus acting in reckless disregard of Masimo's patent rights.

189. As a consequence of True Wearables' infringement of the '848 patent, Masimo has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

190. Upon information and belief, unless enjoined, True Wearables, and/or others acting on behalf of True Wearables, will continue their infringing acts, thereby causing additional irreparable injury to Masimo for which there is no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment in its favor against Defendants for the following relief:

A.     Pursuant to 35 U.S.C. § 271, a determination that True Wearables and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them have infringed each of the '564, '271, '866, '966, '847, and '848 patents through the manufacture, use, importation, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271;

B.     Pursuant to 35 U.S.C. § 283, an injunction enjoining True Wearables and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them from infringing the '564, '271, '866, '966, '847, and '848 patents through the manufacture, use, importation, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271, including preliminary and permanent injunctive relief;

C.     Pursuant to 35 U.S.C. § 284, an award compensating Masimo for True Wearables' infringement of the '564, '271, '866, '966, '847, and '848 patents through payment of not less than a reasonable royalty on True Wearables' sales of infringing products;

D.     Pursuant to 35 U.S.C. § 284, an award increasing damages up to three times the amount found or assessed by the jury for True Wearables' infringement of each of the '564, '271, '866, '966, '847, and '848 patents in view of the willful and deliberate nature of the infringement;

1    E.    Pursuant to 35 U.S.C. § 285, a finding that this is an exceptional
2  case, and an award of reasonable attorneys' fees and non-taxable costs;

3    F.    An assessment of prejudgment and post-judgment interest and
4  costs against True Wearables, together with an award of such interest and costs,
5  pursuant to 35 U.S.C. § 284;

6    G.    That Defendants, and each of them, be adjudged to have
7  misappropriated Plaintiffs' trade secrets in violation of the United States Defense
8  of Trade Secrets Act of 2016, 18 U.S.C. §§ 1836 *et seq.*, and that True Wearables
9  acts in doing so be adjudged willful, malicious, and done knowingly;

10   H.    That Defendants, and each of them, be adjudged to have
11  misappropriated Plaintiffs' trade secrets in violation of the California Uniform
12  Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*, and that Lamego's acts in doing
13  so be adjudged willful, malicious, oppressive, and done knowingly

14   I.    That Lamego be adjudged to have breached the Masimo
15  Agreements, and that Lamego's acts in doing so be adjudged willful, malicious,
16  oppressive, and done knowingly;

17   J.    For an order that Lamego specifically perform the Masimo
18  Agreements;

19   K.    For preliminary and permanent injunctions enjoining Lamego from
20  breaching the Masimo Agreements;

21   L.    That Lamego be adjudged to have breached the Cercacor
22  Agreement, and that Lamego's acts in doing so be adjudged willful, malicious,
23  oppressive, and done knowingly;

24   M.    For an order that Lamego specifically perform the Cercacor
25  Agreement;

26   N.    For preliminary and permanent injunctions enjoining Lamego from
27  breaching the Cercacor Agreement;

28  / / /

-48-

O.     That the Court award Cercacor its actual damages caused by Lamego's breach of his fiduciary duty to Cercacor;

P.     That Defendants, and each of them, be adjudged to have been unjustly enriched;

Q.     That Defendants and each of them, their respective agents, servants, employees, and attorneys, and all those persons in active concert or participation with each of them, be forthwith temporarily, preliminarily, and thereafter permanently required to return all of Plaintiffs' trade secrets and confidential information and enjoined from further using and disclosing to any third parties any of Plaintiffs' trade secrets and confidential information;

R.     That Defendants, their respective agents, servants, employees, and attorneys, and all those persons in active concert or participation with Defendants, be forthwith temporarily, preliminarily, and thereafter permanently required to return all of Plaintiffs' trade secrets and enjoined from further using and disclosing to any third parties any of Plaintiffs' trade secrets;

S.     That Defendants be enjoined from selling or offering to sell any product, including True Wearables Oxxiom product, that includes or uses any of Plaintiffs' trade secrets;

T.     That Defendants, and each of them, be directed to file with this Court and to serve on Plaintiffs within thirty (30) days after the service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which Defendants, and each of them, have complied with the injunction;

U.     That Defendants, and each of them, be required to account to Plaintiffs for any and all gains, profits, and advantages derived by each of them, and all damages sustained by Plaintiffs, by reason of Defendants' acts complained herein;

V.     That Plaintiffs be awarded exemplary damages from Defendants, and each of them, pursuant to Cal. Civ. Code §§ 3294 and 3426.3(c);

1    W.   An award of taxable costs; and

2    X.   That this Court award such other and further relief as this Court

3  may deem just.

4

5                                Respectfully submitted,

6                                KNOBBE, MARTENS, OLSON & BEAR, LLP

7

   Dated:___June 17, 2019_____    By: */s/ Brian C. Claassen*

8                                     Joseph R. Re
9                                     Stephen C. Jensen
                                      Irfan A. Lateef
10                                    Brian C. Claassen

11                                    Attorneys for Plaintiffs,
                                      Masimo Corporation and
12                                    Cercacor Laboratories, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

  Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Masimo Corporation and Cercacor Laboratories, Inc., hereby demand a trial by jury on all issues so triable.

        Respectfully submitted,

        KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 17, 2019   By: */s/ Brian C. Claassen*

        Joseph R. Re
        Stephen C. Jensen
        Irfan A. Lateef
        Brian C. Claassen

        Attorneys for Plaintiffs,
        Masimo Corporation and
        Cercacor Laboratories, Inc.